**HERBKO INTERNATIONAL, INC., Appellant,**

v.

**KAPPA BOOKS, INC., Appellee.**

No. 02–1047.

United States Court of Appeals, Federal Circuit.

DECIDED: Sept. 3, 2002.

Gerard F. Dunne, Law Office of Gerard F. Dunne, of New York, NY, for appellant.

George A. Smith, Jr., Howson and Howson, of Spring House, PA, for appellee.

Before RADER, GAJARSA, and PROST, Circuit Judges.

RADER, Circuit Judge.

The U.S. Patent and Trademark Office (PTO) Trademark Trial and Appeal Board (Board) granted summary judgment canceling Herbko International, Inc.'s registered trademark CROSSWORD COMPANION and design for crossword puzzle systems. *Kappa Books, Inc. v. Herbko Int'l, Inc.*, Cancellation No. 26,378, slip op. at 7–8 (TTAB July 18, 2001) (*Kappa Rehearing*). The Board canceled the mark on the basis that Kappa Books, Inc., showed both prior use of the mark and a likelihood of confusion between the marks. *Id.* at 7; *Kappa Books, Inc. v. Herbko Int'l, Inc.*, Cancellation No. 26,378, slip op. at 7 (TTAB May 31, 2000) (*Kappa*). Because the Board erred in determining that

Kappa's prior use created proprietary rights, this court reverses.

## I.

Herbko manufactures and sells the Crossword Companion Roll–A–Puzzle ® System, a handheld device with scrollable rolls of crossword puzzles. The system uses a variety of replacement rolls with multiple puzzles on each roll. Herbko markets its puzzle system through a number of stores, including Marshalls and K–Mart, and through several catalogs.

In June 1994, Herbko filed an intent-to-use (ITU) application seeking federal reg-istration of the mark CROSSWORD COMPANION and design for its crossword puzzle system. In its amendment to allege use, Herbko declared September 22, 1994 as the date of its first use of the mark in commerce. Herbko later obtained registration of the mark CROSSWORD COMPANION and design for a "crossword puzzle system, namely paper crossword puzzle rolls and hand held puzzle roll scrolling device sold as a unit and crossword puzzle replacement rolls sold separately." Reg. No. 1,914,863. Herbko's mark and design appears below:

Kappa publishes a variety of paperback books. Among Kappa's books is a series of crossword puzzle books sold under the name CROSSWORD COMPANION. Kappa first used the name CROSSWORD COMPANION in 1993. Between April and October of that year, Kappa shipped over 1,056,200 copies of the first CROSSWORD COMPANION book to WalMart. WalMart sold the books both individually and as part of a set of "companion" activity books. Kappa made no significant sales of the books in 1994. In February 1995, Kappa recommenced shipments of its CROSSWORD COMPANION books, selling 918,705 books from 1995 to 1997. Reviewing the evidence in a light most favor-able to Herbko, the non-moving party, this court assumes that Kappa did not publish a second volume of its crossword puzzle books until 1995.

In December 1996, Kappa became aware of Herbko's CROSSWORD COMPANION mark. In June 1997, Kappa filed a petition seeking cancellation of Herbko's mark on the grounds of priority of use and likelihood of confusion.[1] In an initial opinion, the Board held that Kappa's 1993 use of the name CROSSWORD COMPANION constituted a non-technical trademark use that Kappa perfected when it subsequently published a second volume in 1995. *Kappa*, slip op. at 5–6. Finding no genuine issue of material fact on either priority of

---

1. Before any action was taken on its petition, Kappa filed its own application, in July 1997, to register CROSSWORD COMPANION for "crossword puzzle books, published in a ser-ies." The PTO refused registration to Kappa on the grounds of likelihood of confusion with Herbko's mark.

use or likelihood of confusion, the Board entered summary judgment for Kappa. *Id.* at 8. On reconsideration the Board affirmed its initial decision. *Kappa Rehearing*, slip op. at 7.

Herbko timely appealed to this court, which has jurisdiction under 28 U.S.C. § 1295(a)(4) (2000). On appeal, Herbko argues that Kappa's use of the mark as a book title constitutes a descriptive use of the mark, and that Kappa is not entitled to priority without evidence that the relevant public associated the mark with a single source before Herbko's ITU filing date. Conversely, Kappa argues that use of the mark in connection with a book series establishes priority back to the first volume of the series under trademark law's analogous use theory. Kappa alternatively argues that the policy behind the rule that single book titles are not inherently distinctive does not apply to its crossword puzzle books.

## II.

■ This court reviews the Board's grant of summary judgment without deference. *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1576, 19 USPQ2d 1424, 1427 (Fed.Cir. 1991). Thus, this court must decide for itself if the pleadings and record evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); 37 C.F.R. § 2.116(a) (2002) (Federal Rules of Civil Procedure apply to inter-party proceedings before the Board). In so doing, this court draws all reasonable factual inferences in the non-movant's favor. This court reviews the Board's conclusions on questions of law without deference. *Recot, Inc. v. Becton,* 214 F.3d 1322, 1327, 54 USPQ2d 1894, 1897 (Fed.Cir.2000).

■ A person "who believes that he is or will be damaged ... by the registration of a mark on the principal register" may petition to cancel the registration under 15 U.S.C. § 1064 (2000). To obtain cancellation of the registration, the petitioning party must show both standing and valid grounds for cancellation. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945, 55 USPQ2d 1842, 1844 (Fed.Cir.2000). Standing requires only that the petitioner have a "real interest" in the cancellation proceeding. *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1092, 220 USPQ 1017, 1020 (Fed.Cir.1984). In most settings, a direct commercial interest satisfies the "real interest" test. *Cunningham*, 222 F.3d at 945. Except when dealing with incontestable marks, any reason that would have precluded registration in the first instance suffices as a valid ground for cancellation. *Id.* at 946.

## III.

■ In the present case, Kappa's direct commercial interest in the CROSSWORD COMPANION mark provides standing for these cancellation proceedings. The record shows that Kappa shipped over a million CROSSWORD COMPANION books to WalMart before Herbko filed its ITU application. Kappa followed its initial shipments with shipments of a second CROSSWORD COMPANION book less than two years later. Moreover, Kappa has filed a trademark application for the mark CROSSWORD COMPANION as the title of its book series. Based on the record, Kappa is not a "mere intermeddler" whom the standing requirement would bar from initiating cancellation proceedings. *Job's Daughters*, 727 F.2d at 1092.

One valid ground for cancellation is section 2(d) of the Lanham Act, which precludes registration when a mark is likely

to cause confusion with a mark or trade name previously used or registered by another. 15 U.S.C. § 1052(d) (2000); *Cunningham*, 222 F.3d at 946. Hence, a party petitioning for cancellation under section 2(d) must show that it had priority and that registration of the mark creates a likelihood of confusion.

### Priority

██ To establish priority, the petitioner must show proprietary rights in the mark that produce a likelihood of confusion. *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 1320, 209 USPQ 40, 43 (CCPA 1981). These proprietary rights may arise from a prior registration, prior trademark or service mark use, prior use as a trade name, prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights. *Id.; see, e.g., Nat'l Cable Television*, 937 F.2d at 1582 (canceling mark based on petitioner's prior use of trade name); *Knickerbocker Toy Co. v. Faultless Starch Co.*, 59 C.C.P.A. 1300, 467 F.2d 501, 508–09, 175 USPQ 417, 422 (CCPA 1972) (permitting reliance on copyrighted appearance of stuffed rag doll in opposition and cancellation proceedings).

██ Before a prior use becomes an analogous use sufficient to create proprietary rights, the petitioner must show prior use sufficient to create an association in the minds of the purchasing public between the mark and the petitioner's goods. *Malcolm Nicol & Co. v. Witco Corp.*, 881 F.2d 1063, 1065, 11 USPQ2d 1638, 1639 (Fed.Cir.1989). A showing of analogous use does not require direct proof of an association in the public mind. *T.A.B. Sys.*

*v. Pactel Teletrac*, 77 F.3d 1372, 1375, 37 USPQ2d 1879, 1882 (Fed.Cir.1996). Nevertheless, the activities claimed to create such an association must reasonably be expected to have a substantial impact on the purchasing public before a later user acquires proprietary rights in a mark. *Id.*

██ The Board held that Kappa's use of the mark on its first CROSSWORD COMPANION book in 1993 constituted an analogous use that was perfected when it later produced its second CROSSWORD COMPANION book in 1995. *Kappa*, slip op. at 5–6. According to the Board's decision, the proprietary rights for the title of the book series date back to the beginning of the series (i.e., to the date of the first volume in the series) if the second volume in the series is published within a reasonable time. *Id.* The Board's decision, therefore, imposes only one requirement on a party seeking to show such proprietary rights: a reasonable timeliness requirement.

██ The Board's decision is contrary to this court's precedent. That precedent clearly requires not only timeliness, but also that Kappa use the mark in a manner reasonably expected to create an association between the mark and its goods. *See Malcolm Nicol*, 881 F.2d at 1065. This court's precedent also clearly holds that the title of a single book cannot serve as a source identifier.[2] *In re Cooper*, 45 C.C.P.A. 923, 254 F.2d 611, 614–15, 117 USPQ 396, 399–400 (CCPA 1958) (titles of single books cannot be registered as a trademark); *see also* Trademark Manual of Examining Procedure § 1202.08 (3rd ed. June 2002) ("The title of a single creative work is not registrable on the Principal

---

**2.** While titles of single works are not registrable, they may be protected under section 43(a) of the Lanham Act upon a showing of secondary meaning. *See, e.g., EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.,* 228 F.3d 56, 63 (2d Cir.2000), *amended by* 2000 U.S.App. Lexis 30761 (2d Cir.2000); *Sugar Busters LLC v. Brennan,* 177 F.3d 258, 269 (5th Cir.1999).

Register or the Supplemental Register."). Thus, the publication of a single book cannot create, as a matter of law, an association between the book's title (the alleged mark) and the source of the book (the publisher). As such, if a later party uses or applies for a trademark before the creation of a series (i.e., before publication of a second volume), the proprietary rights for the series title date back to the first volume of the series *only* if the second volume is published within a reasonable time with a requisite association in the public mind. That association requires more than publication of a single book.

In this case, Kappa did not provide evidence of a second volume before Herbko's 1994 ITU application. Kappa must rely, therefore, on the 1993 sales of its first CROSSWORD COMPANION volume to show the required association between the CROSSWORD COMPANION mark and its puzzle books. Kappa sold over a million copies of the first volume to WalMart in 1993. Despite Kappa's substantial sales in 1993, however, those sales pertain only to the first CROSSWORD COMPANION volume. As indicated above, such sales are insufficient to form the needed association. Even sales of a large number of copies of a single work cannot create a source identifying association in the public mind unless this court abandons its precedent that a single work cannot serve as a source identifier. *Cooper,* 254 F.2d at 614–15. Because sales of a single book title are insufficient to create proprietary rights and because Kappa provided no other evidence of association creating activities (e.g., use of mark as trade name), the Board erred in holding Kappa established priority to the mark.

Alternatively, Kappa argues that the underlying reasons for precluding registrability of single literary titles are inapplicable to its crossword puzzle books. Specifical-ly, Kappa posits that, in this case, purchasers have a generic name, such as "crossword puzzle book," by which to identify or request a book. Thus, Kappa argues that the CROSSWORD COMPANION title itself serves as an identifier of the source of the books rather than as the title or proper name of the books. According to Kappa, such titles may be inherently distinctive, thereby serving as a source identifier without a showing of secondary meaning.

In *Cooper,* the Court of Customs and Patent Appeals held that a single book title serves to identify the book a purchaser desires but does not function to identify the source of that book. 254 F.2d at 614–15. As explained by *Cooper,* the public may associate a single book title with, at most, an author or a subject, but not with the source of the book—a publisher or printer. *Id.* at 615–16. While acknowledging that "[t]he name for a series . . . has a trademark function in indicating that each book of the series comes from the same source as the others," the court in *Cooper* stated that titles of single works merely serve to describe the work no matter how unrelated to the book contents. *Id.* at 615; *see also In re Polar Music Int'l AB,* 714 F.2d 1567, 1572, 221 USPQ 315, 318 (Fed.Cir.1983) (name ABBA as title for record series serves a trademark function and is not just an identification of the singers). In any event, *Cooper* held that book titles of single works cannot be inherently distinctive because they identify a book, not its source.

Indeed, book titles are often descriptive of book contents. For example, *The Old Man and the Sea* describes a book about an old man and his experiences at sea. Ernest Hemingway, *The Old Man and the Sea* (Scribner 1952). Other book titles, of course, may have little or no relation to the contents of the book, such as *Gone with the Wind,* which is a fictional novel about

several individuals living in Atlanta during the Civil War. Margaret Mitchell, *Gone with the Wind* (Macmillan Publishing Co.1936); *see* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 10:3 (4th ed.2002). Regardless of the actual relation of the title to the book, this court's precedent has treated all single works, such as single book titles, as "inherently descriptive" at best and "inherently generic" at worst. *Cooper*, 254 F.2d at 614–15; *see also* McCarthy § 10:4 (PTO treats titles of single works as generic and not registrable even upon showing of secondary meaning); *In re Posthuma*, 45 USPQ2d 2011, 2012–13, 1998 WL 132923 (TTAB 1998) (prohibiting registration for the title of a single theater production).

■ Even where a title bears little or no relation to the book contents, however, another reason forecloses trademark rights in the title to a single book, at least beyond expiration of the book's copyright. That reason results from the interplay between copyright and trademark law. Specifically, while trademarks endure as long as the mark is used, copyrights eventually expire. Upon expiration of the copyright, others have the right to reproduce the literary work and to use the title to identify the work. *See* McCarthy, *supra*, § 10:4 (citing J.L. Vana, *Single Work Titles and Group Artist or Author Names: Registrability Revisited*, 88 Trademark Rep. 250 (1998)). For example, once the copyright to *Gone with the Wind* expires, a variety of publishers may wish to market copies of the work. A trademark in the title to this single book would compromise the policy of unrestricted use after expiration of the copyright because a book with a trademarked title, of course, could be published only under a different title. *Gone with the Wind* would perhaps become *That Book About Scarlett O'Hara and Rhett Butler* or *My Life with Tara, 1864*. The policy against proprietary rights in the titles to single books therefore finds additional support in the interface with copyright law.

Despite Kappa's arguments, for the reasons mentioned above, there is no basis for holding that titles of single works are capable of inherently functioning to identify a source or origin of the book.

In sum, this court's case law prohibits proprietary rights for single book titles. As a result, the Board erred in holding on summary judgment that Kappa established proprietary rights sufficient to show priority to the CROSSWORD COMPANION mark.

Likelihood of Confusion

■ The PTO may refuse to register a trademark that so resembles a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive."[3] 15 U.S.C. § 1052(d). "Whether a likelihood of confusion exists is a question of law, based on underlying factual determinations." *Recot*, 214 F.3d at 1326. The Board and this court determine likelihood of confusion based on the factors set forth in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973). *Recot*, 214 F.3d at 1326. The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but "may focus ... on dispositive factors, such as similarity of the marks and relatedness of the goods." *Han Beauty, Inc. v. Alberto–Culver Co.*, 236 F.3d 1333, 1336,

**3.** Indeed, the PTO refused Kappa's application to register CROSSWORD COMPANION for its book series on the ground that it was likely to cause confusion with Herbko's registered mark.

57 USPQ2d 1557, 1559 (Fed.Cir.2001) (citing *In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1406–07, 41 USPQ2d 1531, 1533 (Fed.Cir.1997)). While evidence of actual confusion factors into the *DuPont* analysis, the test under § 1052(d) is likelihood of confusion, not actual confusion. Hence, a showing of actual confusion is not necessary to establish a likelihood of confusion. *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1571, 218 USPQ 390, 396 (Fed.Cir.1983).

■ Turning to the relevant *DuPont* factors, the "similarity or dissimilarity of the marks in their entireties" is a predominant inquiry. *DuPont*, 476 F.2d at 1361. This inquiry examines the relevant features of the marks, including appearance, sound, connotation, and commercial impression. *Recot*, 214 F.3d at 1329. Although examining the marks in their entireties, the comparison, for rational reasons, may give more or less weight to a dominant feature of the marks. *Giant Food*, 710 F.2d at 1570.

■ In this case, the Board focused on the word portion of Herbko's mark, stating that the design feature of Herbko's mark was insufficient to distinguish between Herbko and Kappa's marks. *Kappa*, slip op. at 6. Indeed, the word portion of Herbko's mark is identical to Kappa's in appearance and sound. Moreover the words convey, at minimum, some association with crossword puzzles. The only difference between the marks is that Herbko's mark displays the words in a two-row grid between two shorter black bands, with each letter displayed in a separate grid box. This design connotes a crossword puzzle, which reinforces the connotation created by the words of the mark. Thus, the puzzle design does not convey any distinct or separate impression apart from the word portion of the mark. Rather, it serves only to strengthen the impact of the word portion in creating an association with crossword puzzles.

Because the impact of the design in the overall commercial impression is minor when compared with the words, a consumer viewing Herbko's mark would attach greater significance to the words CROSSWORD COMPANION than to the crossword puzzle design. The words dominate the design feature. *See In re Shell Oil Co.*, 992 F.2d 1204, 1206, 26 USPQ2d 1687, 1688 (Fed.Cir.1993) (word portion of RIGHT–A–WAY marks dominate over differences in arrow designs); *Giant Food*, 710 F.2d at 1570 (word GIANT is the dominant feature of the mark GIANT HAMBURGERS and design). The puzzle design—the only difference between the marks—does not sufficiently distinguish the marks. *See CBS, Inc. v. Morrow*, 708 F.2d 1579, 1581–82, 218 USPQ 198, 200 (Fed.Cir.1983) ("[M]inor design features do not necessarily obviate likelihood of confusion arising from consideration of the marks in their entireties."). This court agrees with the Board that the words dominate and that the addition of the puzzle design does not diminish the· substantial identity of the marks in their entireties.

■ Another *DuPont* factor relevant to the present case is the "similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use." *DuPont*, 476 F.2d at 1361. In the context of a cancellation based on prior use, this "relatedness of the goods" factor requires a careful comparison between the goods and services described in a registration and the goods and services connected with the prior use of the mark. Even if the goods and services are not identical or specifically related in kind, they may be sufficiently related in the mind of the consuming public to cause confusion concerning the source or origin

of the goods and services. *Recot,* 214 F.3d at 1329.

Despite Herbko's arguments to the contrary, the parties' goods are very similar. Herbko's registration lists the goods as a "crossword puzzle system, namely paper crossword rolls and hand held puzzle roll scrolling device sold as a unit and crossword puzzle replacement rolls sold separately." Reg. No. 1,914,863. Kappa used the mark on crossword puzzle books. Although Herbko provides a game device that allows consumers to scroll between multiple puzzles printed on a paper roll while Kappa provides crossword puzzles printed in book format, both parties' goods involve crossword puzzles printed on paper. Herbko's system for scrolling between puzzles as compared with turning a page in a book does not alter the substantial relatedness of the products. As the Board found, consumers would very likely presume the CROSSWORD COMPANION puzzles emanated from the same source whether they are bound in books or presented through a mechanical device. Whether scrolling or turning, the parties' goods are extremely similar.

Two other factors also favor a finding of likelihood of confusion, namely the channels of trade and the sophistication of purchasers. *DuPont,* 476 F.2d at 1361. As this court recently reiterated, absent restrictions in the registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers. *Hewlett–Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261, 1268, 62 USPQ2d 1001, 1005 (Fed.Cir.2002); *CBS,* 708 F.2d at 1581. In this case, the record shows that both parties market their goods through similarly priced department stores to similar classes of purchasers. Kappa markets its books through WalMart while Herbko markets its system through K–Mart and Marshalls,

retail stores very similar to WalMart. This overlap in trade channels and class of purchasers bolsters the likelihood of confusion.

None of the remaining *DuPont* factors support Herbko's claim that there is no likelihood of confusion between the marks. Thus, each of the relevant *DuPont* factors for which there is record evidence favors a determination that the marks are likely to cause confusion as to the source or origin of the crossword puzzle products.

In sum, this court concludes that the Board correctly found a likelihood of confusion between the marks. Consumers encountering both parties' goods are likely to believe that the goods originate from the same or a related source.

## CONCLUSION

Despite the "puzzling" nature of this case, the Board did not err in its conclusion that Herbko's CROSSWORD COMPANION mark is sufficiently similar to Kappa's mark, when applied to the goods at issue, that purchasers would likely believe those goods were associated with a single source. Because the publication of a single volume by itself does not create the needed proprietary rights in the book title, however, Kappa has not shown priority to the mark. Therefore, this court reverses the grant of summary judgment for Kappa.

## COSTS

Each party shall bear its own costs.

*REVERSED.*