THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
18 June 2008
AD

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Innovative Companies, LLC
_____

Serial No. 76607252
_____

Myron Amer of Myron Amer, P.C. for Innovative Companies, LLC.

David C. Reihner, Trademark Examining Attorney, Law Office 111 (Craig D. Taylor, Managing Attorney).
_____

Before Grendel, Drost, and Mermelstein, Administrative Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On August 11, 2004, Innovative Companies, LLC (applicant) applied to register the mark FREEDOMSTONE (standard character form) on the Principal Register for goods ultimately amended to read: "building stones used as landmarks or cornerstones" in Class 19. The application (Serial No. 76607252) was based on applicant's assertion of a bona fide intention to use the mark in commerce. Applicant's mark was published for opposition on December 13, 2005. A Notice of Allowance was issued on March 7,

2006.  On April 5, 2006, applicant filed a Statement of Use alleging that it had used the mark on the goods anywhere and in commerce at least as early as March 9, 2006.  The Statement of Use included a specimen showing the mark as set out below:

## FREEDOM STONE

With the specimen, applicant also submitted "a new drawing consistent with the specimen."  Response filed April 5, 2006.  The substitute drawing depicted the mark as FREEDOM STONE.

The examining attorney then refused to register applicant's mark because the "mark as depicted on the drawing disagrees with the mark as it appears on the specimen."  Office Action dated June 16, 2006 at 1.  The examining attorney also noted, inter alia, that "a disclaimer of the word 'stone' would have to be submitted." *Id.* at 2.  In its next response, applicant offered a disclaimer of the word "Stone."  Response dated August 3, 2006 at 2.[1]

Subsequently, the examining attorney also refused to register applicant's mark on the ground that the mark

---

[1] In the event that applicant ultimately prevails in this application, this disclaimer should be entered.

constitutes the title of a single work of art rather than a

series of goods in trade under the provisions of Sections

1, 2, and 45 of the Trademark Act.  15 U.S.C. §§ 1051,

1052, and 1127.  After the examining attorney made both

refusals final, applicant appealed.

Drawing Issue

We begin by noting that:

In an application under section 1(b) of the Act, the
drawing of the mark must be a substantially exact
representation of the mark as intended to be used on
or in connection with the goods and/or services
specified in the application, and once an amendment to
allege use under §2.76 or a statement of use under
§2.88 has been filed, the drawing of the mark must be
a substantially exact representation of the mark as
used on or in connection with the goods and/or
services.

37 CFR § 2.51(b).

Applicant's drawing for FREEDOMSTONE is not a

substantially exact representation of the mark as used on

the specimen of use.  TBMP § 807.12(e) (5th ed. rev. Sept.

2007) ("A compound word mark may be presented as one

unitary term (*e.g.*, BOOKCHOICE) or as two words (*e.g.*, BOOK

CHOICE) on the drawing.  The examining attorney should

determine whether the mark may be presented as separate

words based on its commercial impression, taking into

account any specimen(s) of record"); *In re Roberts*, ___

USPQ2d ___ (TTAB May 2, 2008), slip op. at 12 ("In

addition, "I Rest My Case" as it appears on applicant's

message board, while containing all of the letters

comprising applicant's proposed mark, disagrees with

**irestmycase** as it appears on applicant's drawing page.

Thus, we find that such uses fail to show use of

**irestmycase** as a mark or otherwise"). However, if a

drawing is not a substantially exact representation of the

mark on the specimen, the Trademark Rules set out when the

drawing may be amended to agree with the specimen:

> In an application based on a bona fide intention to
> use a mark in commerce under section 1(b) of the Act,
> the applicant may amend the description or drawing of
> the mark only if:
>
> (1) The specimens filed with an amendment to allege
> use or statement of use, or substitute specimens filed
> under §2.59(b), support the proposed amendment; and
>
> (2) The proposed amendment does not materially alter
> the mark. The Office will determine whether a
> proposed amendment materially alters a mark by
> comparing the proposed amendment with the description
> or drawing of the mark filed with the original
> application.

37 CFR § 2.72(b).

The examining attorney argues (Brief at unnumbered p.

5) that:

> Initially, Freedomstone appears to be the simple
> combination of the words FREEDOM and STONE. However,
> FREEDOMSTONE may present to purchasers impressions not
> present in the separate words. For example, the
> designation FREEDOMSTONE may be viewed as the word
> combination FREEDOMS TONE, which suggests that there
> is a sound of freedom related to applicant's goods.

4

Then again, FREEDOMSTONE may be looked at as FREE DOM STONE ("Dom" being the German for dome, which suggests that applicant's goods may be used as part of such structures).

Applicant responds by arguing that "the element of focus is a 'space' between the last letter 'm' of 'freedom' and the first letter 's' of 'stone,' a change that would not require a further search since, as shown by experience, a clearance search preparatory to trademark adoption and use is done phonetically and the two-word and one-word versions are phonetically identical." Reply Brief at unnumbered p. 2.

"[U]nder the new rules, any and all proposed amendments are subject to the material alteration standard, and no amendment is permissible if it materially alters the mark sought to be registered, i.e., the mark depicted on the drawing." *In re Who? Vision Systems Inc.*, 57 USPQ2d 1211, 1217 (TTAB 2000). In determining whether a proposed amendment to a mark is material, the "modified mark must contain what is the essence of the original mark, and the new form must create the impression of being essentially the same mark." *Id.*, *quoting Visa International Service Assn. v. Life-Code Systems,* 220 USPQ 740, 743 (TTAB 1983). "[T]he new and old forms of the mark must create essentially the same commercial impression." *In re*

*Nationwide Industries Inc.*, 6 USPQ2d 1882, 1885 (TTAB 1988).  One factor to be considered in this analysis is whether another search by the examining attorney would be necessary as a result of the amendment.  *Who? Vision Systems*, 57 USPQ2d at 1217-18.  We agree with applicant that an appropriate search of the mark FREEDOMSTONE for registrations or pending applications would include the words "freedom" and "stone," and thus a new search would not be required by the proposed amendment.[2]

Recently, the board was faced with a similar situation.  In that case, the party received a registration in which the mark was displayed in the form shown below:



*Paris Glove of Canada Ltd. v. SBC/Sporto Corp.*, 84 USPQ2d 1856 (TTAB 2007).  When the party submitted its combined §§ 8 and 9 affidavit for renewal, the mark was displayed as AQUASTOP in a semicircle.  The board held that:



---

[2] While it is not a formal part of the record, we note that the search record in this application indicates that the examining attorney did this type of search.

> "[T]here is no material alteration between the original, registered AQUA STOP rectangular form of the mark which shows the words depicted on two lines, and the semicircular and linear forms which depict the words on one line and, in the case of the semicircular form, as one word. This is because the commercial impression of the mark is dependent upon the literal terms AQUA STOP and not on the rectangular, semicircular or linear forms of display."

*Id.* at 1862.

Similarly, we agree that the amendment of the drawing from FREEDOMSTONE to FREEDOM STONE does not result in a material alteration. While the examining attorney's arguments are creative, potential purchasers of building stones used as landmarks or cornerstones are likely to view the terms FREEDOMSTONE and FREEDOM STONE the same. It is highly unlikely that they would separate the words as FREEDOMS TONE and understand the term FREEDOMS as a misspelled possessive. It is even less likely that these purchasers would divide the term FREEDOMSTONE into two English words ("free" and "stone") with a German word ("dom") in the middle. This case is also similar to other cases in which the board found no difference in meaning between the modified mark and the original mark in the drawing. *See In re Finlay Fine Jewelry Corp.*, 41 USPQ2d 1152 (TTAB 1996) (NEW YORK JEWELRY OUTLET not a material alteration of NY JEWELRY OUTLET) and *In re Larios, S.A.*,

35 USPQ2d 1214 (TTAB 1995) (VINO DE MALAGA LARIOS and

design not a material alteration of GRAN VINO MALAGA LARIOS

with similar design).



Therefore, while we agree that the mark in the original

drawing is not a substantially exact representation of the

mark in the specimen (37 CFR §2.51(b)),[3] the examining

attorney's refusal to register on this basis is reversed

because the substitute drawing is not a material alteration

under 37 CFR § 2.72(b).

Single Work Refusal

The examining attorney argues that the "word

FREEDOMSTONE acts to identify a single stone rather than a

series of stones…. A trademark is defined as a word (among

other identifiers) that identifies the goods of a party and

indicates the source of those goods. Trademark Act § 45.

---

[3] There is no dispute that the mark in the substitute drawing is
a substantially exact representation of the mark on the specimen.

A trademark identifies a series of items moving in commerce, not a single item."  Brief at 7.  The evidence of record[4] shows that the term FREEDOM STONE identifies a particular granite stone that will apparently serve as the cornerstone for the Freedom Tower that is to be erected at the World Trade Center site in New York City (emphasis added in quotations):

> Adirondack Granite to be Cornerstone of Freedom Tower
> It isn't everyday that a 20-ton slab of rock attracts so much attention – unless it's the **Freedom Stone**.
> That's the name a Long Island stone company has given to what will become the cornerstone of the soon to be built Freedom Tower at the World Trade Center site.
> On Independence Day, Pataki will preside over a ceremony to lay the cornerstone of the building, marking the start of construction on what would be the world's tallest building at 1,776 feet.
> www.network54.com
>
> This particular granite, which Ms. Pearse has named the "**Freedom Stone**" was chosen in part because granite is the official gem of New York State.
> This block will sit atop a 14-by-16 foot foundation of concrete and steel bars at the base of Freedom Tower, which will be the tallest and most symbol-laden of the six office buildings planned on and around the trade center site.
> www.newyorktimes.com
>
> Freedom Tower cornerstone stirs emotions

---

[4] We have given the Google search results evidence little weight. *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) ("Search engine results — which provide little context to discern how a term is actually used on the webpage that can be accessed through the search result link — may be insufficient to determine the nature of the use of a term or the relevance of the search results to registration considerations").

… Quarried in upstate New York, the rough stone first traveled to Hauppauge, where it was designed, in 2003. It arrived at Ground Zero on July 4, 2004. A year later, it sat covered up by a tarp after design changes to the 1,776 foot Freedom Tower made its placement obsolete.

Then, two weeks ago at dawn, the slab was hoisted onto a flatbed truck and quietly carted back to Innovative Stone, where it will be reconfigured to align with a revamped design…

It was Pearse who named the rock The **Freedom Stone**. She donated the $14,000 quarried stone and estimates her firm has spent nearly six times that much on the entire project.
www.newsday.com

Applicant argues as follows:

[I]n the case at hand, we are not dealing with a "theatrical performance" but with "Building stones, namely, used as landmarks or cornerstones," which was suggested by the examining attorney and accepted by the applicant. It is significant; the recommended description of the examining attorney is in the plural, and thus somewhat inconsistent with the "Title" refusal which one would expect for a reference in the single sense, namely, to a landmark X or cornerstone X.

More substantive[ly], the examining attorney's citation of, and argument based on, *In re Posthuma* [45 USPQ2d 2011 (TTAB 1998)] is misplaced because "pre-recorded music cassette tapes, stationary [sic], and programs" are NOT a replica of a live theater production, entitled PHANTASM. Rather, "pre-recorded music cassette tapes, etc." are, as correctly held by the TTAB, promotional materials.

Applicant, by analogy, also argues there is support for its position in TMEP 1202.11 in the words STATUE OF LIBERTY being associated with a statue of a distinctive shape and pose in New York Harbor such that the latter, i.e., said shape and pose, is

10

protectable as a mark separate and apart from the words "Statue of Liberty."[5]

The logic of the analogy continues in that the Statue of Liberty marks the historical event of a gift to the United States from France, and the physical object designated FREEDOM STONE marks the 9/11 destruction of the twin towers in lower Manhattan.

As noted in TMEP 1202.11 "the essential question is whether or not the background material, i.e. a marble construction material cornerstone, is or is not, *vis-à-vis* the designation FREEDOM STONE, inherently distinctive. Applicant argues YES, and the examining attorney argues NO.

If as argued by applicant the background position, namely, the marking of the 9/11 terrorist attack, is inherently distinctive, no proof of secondary meaning needs to be introduced; if not, such proof is essential.

Terrorist attacks unfortunately are now a reality of our way of life, and FREEDOM STONE-identified replicas sold by applicant fall on the side of the line as a trademark and not as a mere "Title of a single work/object."

Brief at unnumbered pp. 2-3.

Applicant also submitted the declaration of Karen

Pearse, its Chief Executive Officer, who stated that:

2. the business of applicant, as noted in its tradename, is to make "innovative" structures out of quarry stones such as granite and marble;

3. one such structure is a landmark cornerstone laid at the site of the twin towers destroyed on 9/11, the one at said site being denominated FREEDOM STONE.

4. in addition, miniature-sized replicas are boxed and sold as mementos to the public;

---

[5] We note that there is no reference to the Statue of Liberty in the cited TMEP section.

5. the practice is similar to the actual STATUE OF
LIBERTY on its site in New York harbor, and the
replicas thereof sold as mementos to the public.

While applicant's witness has declared that it is selling
miniature-sized replicas of its "Freedom Stone," as the
examining attorney pointed out, applicant is not seeking
registration for souvenirs or similar items.  Instead, its
goods are identified as "building stones used as landmarks
or cornerstones."  Quite simply, the miniature-sized
replicas are not building stones used as landmarks or
cornerstones.  The evidence of record only identifies one
building stone used as a landmark or cornerstone identified
by the term FREEDOM STONE.  Furthermore, applicant has not
responded to the refusal with evidence that it has any
intention to produce any other building stones used as
landmarks or cornerstones identified with the FREEDOM STONE
mark.

The examining attorney argues that applicant uses the
term FREEDOM STONE as the title of a single creative work.
It has long been held that the title of a book does not
function as a trademark.  *In re Cooper*, 254 F.2d 611, 117
USPQ 396, 400 (CCPA 1958):

> There is a compelling reason why the name or title of
> a book of the literary sort cannot be a trademark.
> The protection accorded the property right in a
> trademark is not limited in time and endures for as

12

> long as the trademark is used. A book, once
> published, is protected against copying only if it is
> the subject of a valid copyright registration and then
> only until the registration expires, so eventually all
> books fall into the public domain. The right to copy
> which the law contemplates includes the right to call
> the copy by the only name it has and the title cannot
> be withheld on any theory of trademark right therein.

The Federal Circuit has revisited the *Cooper* case and reaffirmed its viability. *Herbko International Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002):

> A trademark in the title to this single book would
> compromise the policy of unrestricted use after
> expiration of the copyright because a book with a
> trademarked title, of course, could be published only
> under a different title. Gone with the Wind would
> perhaps become That Book about Scarlett O'Hara and
> Rhett Butler or My Life with Tara, 1864. The policy
> against proprietary rights in the titles to single
> books therefore finds additional support in the
> interface with copyright law.

In the *Herbko* case, the Federal Circuit also referred to the *Posthuma* decision in which the board prohibited "registration for the title of a single theater production." *Herbko*, 64 USPQ2d at 1379. In that case, the board held that "the materials of record all identify PHANTASM as the name of the live theater production, and the purchasing public likely would perceive it as the title of the play, as opposed to perceiving it as a service mark identifying source or origin. In this connection, we believe that the title of a play is perceived in the same

13

manner as is the title of a book which, as discussed above, is unregistrable." *Posthuma*, 45 USPQ2d at 2013. *See also In re Appleby*, 159 USPQ 126, 127 (TTAB 1968) ("[S]ince 'HYPNO-SMOKE' is used merely as the title of a record as distinguished from a series of records, and it is the only name by which the record may be identified, it does not function as a trademark and hence is not registrable").[6]

However, if a mark identifies a series of phonograph records, books, or works of art, it may be registrable as a trademark. *In re Polar Music International AB*, 714 F.2d 1567, 221 USPQ 315, 318 (Fed. Cir. 1983) ("[J]ust showing the name of the recording group on a record will not by itself enable that name to be registered as a trademark. On the other hand, if the owner of the mark controls the quality of the goods, and if the name of that recording group has been used numerous times on different records and has therefore come to represent an assurance of quality to the public, the name may be registered as a trademark since it functions as one"); *In re Scholastic Inc.*, 23 USPQ2d 1774, 1776 (TTAB 1992) ("The name for a series, at least

---

[6] Even if the evidence showed that applicant's mark was a background design, which it does not, applicant's analogy to a background design is not relevant. *Cooper*, 117 USPQ at 400 ("But however arbitrary, novel or non-descriptive of contents the name of a book — its title — may be, it nevertheless describes the book").

while it is still being published, has a trademark function in indicating that each book of the series comes from the same source as the others").

We also note the case of *In re Wood*, 217 USPQ 1345 (TTAB 1983). That case involved an artist's signature on works of art. Again, in that case, there were numerous (or a series) of works of art under the artist's mark:

> We can see no viable distinction between the mark of an individual affixed to any hand-created product, such as, for example, a hand-carved figurine, hand-made furniture to which the craftsman's mark is affixed or hand-made items of wearing apparel, and a work of art to which the artist's name is attached. Nor, to place this case in a modern context, do we see any real difference between an artist's name on a work of art such as a painting and a maker's mark on a poster. Both fulfill the function of identifying a product and distinguishing it from those produced by others. In this case, we believe that the term YSABELLA serves to indicate the source or origin of applicant's works of art.

*Id.* at 1349. *See also In re First Draft Inc.*, 76 USPQ2d 1183, 1189 (TTAB 2005):

> In short, we find no clear precedent dictating that the interface of trademark law with copyright law or with the rights of others to reproduce certain works should prevent an applicant from registering an author's name as a trademark for a series of written works. When the name is found to serve not merely as the designation of the writer of each of the works, but also is used in such a manner as to assure the public that the works are of a certain quality and the name therefore serves as an indicator of the source of the writings, it serves the function of a mark.

15

The instant case differs from any of the above cases in that in those cases the entity claiming trademark rights was the source of more than one phonograph album, book, or work of art.  Even where the mark was held to be the title of a single work (*Herbko*, *Posthuma*, and *Appleby*), there were apparently numerous copies or performances of the same book, album, or theatrical performance.  In this case, the evidence of record indicates that there is a total of one "Freedom Stone" building stone.[7]  It is designated as the cornerstone of the Freedom Tower building under construction in New York City.[8]  Applicant itself has declared (emphasis added) that the business of applicant "is to make 'innovative' structures out of quarry stones" and "one such structure is a landmark cornerstone laid at the site of the twin towers."

---

[7] The fact that the examining attorney suggested an identification of goods in the traditional plural form earlier in the prosecution does not support applicant's argument that the examining attorney's refusal to register its mark for a single building stone is somehow inconsistent with this proposed identification.  These are separate issues and, given the examining attorney's argument that a mark for a single stone would be unregistrable, it would have been strange for the examining attorney to have suggested an identification of goods that would indicate that applicant did not have more than one of the identified product.

[8] Whether the shipment of a single building stone (apparently all within the State of New York) with no apparent intent to make any other building stones with the same mark meets the statutory requirement of use of the mark on goods in commerce that Congress can regulate are issues that have not been developed in this case.  15 U.S.C. § 1127.

However, here applicant has used the mark only on a single stone. While applicant compares its situation to the Statue of Liberty in New York City, it has not offered any evidence that the term STATUE OF LIBERTY has been registered for statues. We add that even if it were, miniature replicas of the "Statue of Liberty" might nonetheless still be considered "statues." In this case, applicant's goods are building stones used as landmarks or cornerstones. There is no evidence that applicant's replicas of its FREEDOM STONE could function as building stones used as landmarks or cornerstones.

Here, we are left with the fact that applicant has applied the term FREEDOM STONE as the title of a single cornerstone. The Federal Circuit has noted that:

> "This court's precedent … clearly holds that the title of a single book cannot serve as a source identifier… Trademark Manual of Examining Procedure §1202.08 (3rd ed. June 2002) ('The title of a single creative work is not registrable on the Principal Register or the Supplemental Register.')."[9]

*Herbko*, 64 USPQ2d at 1378 (citations omitted). The TMEP (Section 1202.08(a) 5th ed. Sept. 2007) sets out what constitutes a single creative work:

---

[9] The current section of the TMEP reads almost identically: "The title of a single creative work is not registrable on either the Principal or Supplemental Register." TMEP § 1202.08 (5th ed. rev. Sept. 2007).

17

> Single creative works include works in which the content does not change, whether that work is in printed, recorded, or electronic form.  Materials such as books, sound recordings, downloadable songs, downloadable ring tones, videocassettes, DVDs, audio CDs and films are usually single creative works. Creative works that are serialized, *i.e.*, the mark identifies the entire work but the work is issued in sections or chapters, are still considered single creative works.  A theatrical performance is also a single creative work, because the content of the play, musical, opera, or similar production does not significantly change from one performance to another.

As such, the title of book, play, or phonograph records or similar recording is not registrable as a trademark.  The FREEDOM STONE cornerstone is similarly a single creative work, although as we pointed out there will be only one such cornerstone in existence.  Inasmuch as we hold that the term FREEDOM STONE is the title of a single creative work, we affirm the examining attorney's refusal to register applicant's mark on that ground.

Decision:  We reverse the examining attorney's refusal to register on the ground that applicant's original drawing is not a substantially exact representation of its mark as used, and that applicant's substitute drawing is a material alteration of the mark.  We affirm the refusal to register applicant's mark on the ground that it is not registrable because it is the title of a single creative work.