THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: December 27, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Primrose Retirement Communities, LLC*
*v.*
*Edward Rose Senior Living, LLC*

_____

Opposition No. 91217095

_____

Troy N. Leonard and Sander J. Morehead of Woods, Fuller, Shultz & Smith P.C.
    for Primrose Retirement Communities, LLC.

Deborah J. Swedlow of Honigman Miller Schwartz and Cohn LLP
    for Edward Rose Senior Living, LLC.

_____

Before Quinn, Kuczma, and Gorowitz,
    Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Edward Rose Senior Living, LLC ("Applicant") filed an application to register the

mark ROSE SENIOR LIVING (in standard characters) ("SENIOR LIVING"

disclaimed) on the Principal Register for the following services:

> Rental of apartments; rental of residential housing;
> management of senior housing communities (in
> International Class 36);
>
> Retirement homes; providing assisted living facilities;
> providing assisted living facilities for Alzheimer and
> dementia clients (in International Class 43); and

> Nursing home services; managed health care services (in International Class 44).

The application was filed under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), alleging in each class first use anywhere on March 22, 2013, and first use in commerce on August 30, 2013. Applicant seeks a geographically unrestricted registration covering the entire United States.

Primrose Retirement Communities, LLC ("Opposer") opposed registration under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark, when used in connection with Applicant's services, so resembles Opposer's previously used and registered mark PRIMROSE (in typed form) for "providing congregate, independent, and assisted living facilities" in International Class 43,[1] as to be likely to cause confusion.[2]

---

[1] Registration No. 2711268, issued April 29, 2003 on the Principal Register; renewed. (27 TTABVUE 13-35). Prior to November 2, 2003, "standard character" drawings were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. TMEP § 807.03(i) (Oct. 2016).

[2] Opposer's registration includes the following statement: "Registration restricted to the area comprising the entire United States, excluding Yellowstone County, Montana, and the surrounding counties, namely, Carbon County, Big Horn County, Treasure County, Mussell Shell County, Golden Valley County, and Still Water County, all in the state of Montana pursuant to Concurrent Use Proceeding 94002167. Concurrent registration with Registration No. 3223813." This third-party registration is for the mark PRIMROSE for "providing assisted living facilities and providing adult daycare services"; issued April 3, 2007; Section 8 affidavit accepted. The registration includes the following statement: "Registration limited to the area comprising Yellowstone County, Montana, and the surrounding counties, namely, Carbon County, Big Horn County, Treasure County, Mussell Shell County, Golden Valley County, and Still Water County, all in the state of Montana pursuant to Concurrent Use Proceeding 94002167. Concurrent registration with Registration Nos. 2711268 and [now cancelled] 2719122."

Applicant, in its answer, admitted that USPTO records show that Opposer is the owner of the pleaded registration. Applicant otherwise denied the salient allegations of likelihood of confusion.[3]

### *The Record*

The record comprises the pleadings; the file of the involved application; testimony (in the form of affidavits or declarations), together with related exhibits, taken by each party;[4] official records, Applicant's responses to discovery requests, as well as certain documents produced by Applicant, introduced by Opposer's notice of reliance; and other official records, Opposer's responses to Applicant's discovery requests, discovery depositions taken of Opposer, and portions of third-party websites, all introduced by way of Applicant's notices of reliance.[5] The parties filed briefs on the case.

---

[3] The Board, in an order dated February 20, 2015, struck the "Affirmative Defenses" listed in the answer. (15 TTABVUE).

[4] The parties stipulated that testimony could be submitted in the form of an affidavit or declaration; and that discovery documents could be relied upon without objection. (27 TTABVUE 9-10). Trademark Rule 2.123(b). *See Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1737-38 (TTAB 2014). Citations in this opinion will be to the TTABVUE docket entry number and the electronic page number where the document or testimony appears. Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to non-confidential parts of the record include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated confidential and which does not appear in TTABVUE, the TTABVUE docket entry number where such material or testimony is located should be included in any citation. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[5] Normally documents produced in response to document production requests may not be made of record by notice of reliance, *see* Trademark Rule 2.120(j)(3)(ii), but in this case the documents are of record pursuant to the parties' stipulation. *See* TBMP § 704.11 (2016).

***The Parties***

Jim Thares founded Opposer in 1989, and began operating retirement communities in 1990 in South Dakota. Opposer's retirement facilities include independent (1991) and assisted (1994) living facilities, as well as memory care units (2005). These facilities are targeted at senior citizens who are looking for places where other seniors live, and that offer amenities and activities designed with senior living in mind. Opposer owns 30 facilities, with 3 under construction, in 15 states; Opposer plans to build 2-3 new facilities each year, and it is presently working on about 10 potential facilities. Opposer employs over 1000 individuals, and its current residents number over 2000. Annual gross revenues and advertising expenditures, designated "confidential," are of record. Opposer advertises its services in all 50 states, promoting itself as providing a happy and healthy environment for seniors, including nutritious meals, life-enrichment activities, social events and wellness programs. Opposer advertises through its website and social media, as well as through other media, including third-party websites, newspapers, magazines, television, radio, outdoor signage, and sponsorship of local organizations.

Applicant, established in 1921, is a privately-held family owned and operated real estate development company. Applicant's projects have included single-family homes, and multi-family communities, including apartments. Applicant began operating senior-living communities under its mark in 2013; it currently owns and operates two facilities in Tennessee and Michigan, with 3 more under construction in Ohio, Michigan and Indiana. Applicant offers three levels of senior-living arrangements,

namely independent living, assisted living and memory care. Paul Mott, Applicant's director of asset acquisition, stated that potential residents and their related decision makers select a senior living community primarily on the bases of location, convenience and amenities. Thus, Mr. Mott asserted that Applicant selects locations with proximity to health care, community services, shopping, places of worship, entertainment and transportation. Amenities at its facilities include dining rooms, general stores, libraries, meeting and game rooms, salons and wellness/fitness centers. Applicant advertises its services through the internet, television and radio, as well as in newspapers and direct mail, and through in-person appearances at senior citizen centers, senior business expos and the like. Warren Rose, Applicant's chief executive officer, stated that Applicant was not aware of Opposer until it filed the notice of opposition.

### *Standing*

Opposer established its standing to oppose registration of the applied-for mark by virtue of its registration of the mark PRIMROSE for the recited services. Thus, Opposer has shown that it is not a mere intermeddler. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1401 (2015); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

*Priority*

As a result of Opposer's ownership of a valid and subsisting registration on the Principal Register for its PRIMROSE mark covering the entire United States except for a portion of Montana, priority is not at issue with respect to the services recited in Opposer's pleaded registration vis-à-vis Applicant's services recited in the present application seeking a nationwide registration. *King Candy, Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

*Likelihood of Confusion*

Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence. In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). Varying weights may be assigned to each *du Pont* factor depending on the evidence presented. *Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687-88 (Fed. Cir. 1993). The relevant *du Pont* factors in the proceeding now before us are discussed below.

***Similarity of the Services, Trade Channels and Consumers***

With respect to the *du Pont* factors regarding the similarity of the services, we must look to the services as identified in the application and Opposer's registration. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014) (quoting *Octocom Sys., Inc. v. Houston Computers Servs., Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990)); *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987); s*ee also Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (likelihood of confusion must be found as to the entire class if there is likely to be confusion with respect to *any* service that comes within the recitation of services in that class). In the present case, Opposer's services are recited as "providing congregate, independent, and assisted living facilities" (in International Class 43). Applicant's services are recited as follows: "rental of apartments; rental of residential housing; management of senior housing communities" (in International Class 36); "retirement homes; providing assisted living facilities; providing assisted living facilities for Alzheimer and dementia clients" (in International Class 43); and "nursing home services; managed health care services" (in International Class 44).

In its brief, Applicant highlights several *du Pont* factors, with lengthy argument. Conspicuously absent from this discussion, however, is the issue of the similarity of the services. Rather, Applicant states that "there is some overlap in the services," and that this factor "slightly favor[s] Opposer," but that Opposer "greatly exaggerates" its importance in the likelihood of confusion analysis. (68 TTABVUE 52).

7

We find that Opposer's "congregate, independent, and assisted living facilities" services are identical in part to Applicant's services of providing "assisted living facilities" in Class 43, and are nearly identical to Applicant's "management of senior housing communities" in Class 36 and "nursing home services" in Class 44. Further, the parties' services otherwise are related. In this connection, we note that Applicant's rental of apartments and residential housing would include rental of apartments and housing to seniors.

Given the identity of the services, at least in part, and the lack of restrictions on trade channels and classes of consumers in the recitations of services, we presume that these services travel through the same channels of trade, namely senior-living and retirement communities, to the same classes of customers, namely senior citizens and/or their families making a housing choice. *Citigroup Inc. v. Capital City Bank Group Inc.*, 98 USPQ2d at 1261, citing *Hewlett Packard Co. v. Packard Press, Inc.*, 281 F.2d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002). *See In re Yawata Iron & Steel Co., Ltd.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968) (where there are legally identical goods, the channels of trade and classes of purchasers are considered to be the same); *American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute*, 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith & Mehaffey*, 31 USPQ2d 1531, 1532 (TTAB 1994); s*ee also In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (even though there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion).

These factors of the identity of the services and the identity of trade channels and classes of consumers weigh in Opposer's favor.

### Third-Party Uses and Registrations

The sixth *du Pont* factor requires us to consider evidence pertaining to the number and nature of similar marks in use on similar services; given the evidence of record, we find that this factor plays a weighty role in our analysis. *Citigroup Inc. v. Capital City Bank Group Inc.*, 98 USPQ2d at 1261. "The purpose of a defendant introducing third-party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different such marks on the bases of minute distinctions.'" *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005).

Opposer states that "[w]hile PRIMROSE is not a 'famous' mark in the conventional sense of the word, it is a strong mark that warrants protection." (62 TTABVUE 39).[6] Applicant contends to the contrary, namely that Opposer's mark is suggestive, pointing to Opposer's testimony that "primrose" suggests a quality of life. (41 TTABVUE 343). To counter Opposer's claim that its mark is strong, Applicant submitted evidence of third-party uses and registrations of ROSE-formative marks for senior care living services, namely, the same types of services rendered by the parties in the present proceeding.

The registrations are as follows (43 TTABVUE):

---

[6] To be clear, Opposer states, in response to Interrogatory No. 16, that it "does not contend Opposer's Mark is 'famous.'" (39 TTABVUE 50).

| Registration No. | Mark | Services |
|---|---|---|
| 2802572 | ROSETTA | Assisted living facilities |
| 3223813 | PRIMROSE | Assisted living facilities |
| 3787186 | CARING ROSE | In-home support services to senior persons, namely, geriatric care management services and personal affairs management services in the nature of the coordination of necessary services and care for older individuals |
| 3851584 | COMPASS ROSE | Providing medical and nursing services in the fields of dementia care and Alzheimer's care for senior citizens |
| 4118456 | ROSE LANE | Assisted living facilities |
| 4239744 | DANIEL ROSE | Retirement homes |
| 4444264 | ROSE ROCK HEALTHCARE | Health care and hospice services; consulting services in the fields of health care and hospices; medical services for residents in private homes and senior living facilities; medical assistance services to residents in senior living facilities |
| 4515016 | ROSE ROCK HOSPICE | Health care and hospice services; consulting services in the fields of health care and hospices; medical services for residents in private homes and senior living facilities; medical |

| | | assistance services to residents in senior living facilities |
|---|---|---|

Applicant also submitted evidence of state trademark registrations for various ROSE-formative marks. (44-45 TTABVUE).

Applicant further introduced a multitude of third-party websites showing various ROSE or ROSE-formative marks used in connection with senior living communities and related services. (46-59 TTABVUE). These include uses of PRIMROSE by a single entity in Texas: PRIMROSE AT CEDAR HILL; PRIMROSE AT HIGHLAND MEADOWS; PRIMROSE AT JOHNSON CREEK; PRIMROSE AT MISSION HILLS; PRIMROSE AT MONTICELLO PARK; PRIMROSE OF SHADOW CREEK; PRIMROSE CASA BELLA; PRIMROSE DEL SOL; PRIMROSE OAKS; and POTTERS HOUSE AT PRIMROSE. Other third-party uses of PRIMROSE include the following: PRIMROSE (CA); PRIMROSE LANE (TX); and PRIMROSE OF FLUSHING (MI). The record also includes the following third-party uses: A ROSE GARDEN; ALL ROSES; ARBOR ROSE; ROSEBROOK; BELLA ROSA PLACE; CAMILIA ROSE; CASA DE ROSA; CASA ROSA; THE CEDARS AT PARK ROSE; CHEROKEE ROSE; COMPASS ROSE; CRESTMARK OF ROSELAWN; DEL ROSA VILLA; DESERT ROSE; ELDERWOOD VILLAGE AT ROSEWOOD; EMERITUS AT ROSE VALLEY; ENGLISH ROSE; GOLDEN LIVING CENTER – ROSE HILL; HILLCREST MABLE ROSE; ROSEWOOD; KINDRED – ROSE MANOR; MAJESTIC ROSE; MELROSE GARDENS; NEWARK ROSE GARDEN; PARK ROSE; PARKROSE CHATEAU; PARKROSE ESTATES; PENROSE; PRAIRIE

11

ROSE; ROSE ARBOR; ROSE BLUMKIN; ROSE COURT; ROSECREEK; ROSE ESTATES; ROSE GARDEN (6 communities); ROSE GARDEN COURT; ROSE GARDEN HOMES; ROSE GLEN; ROSE HILL; ROSE HOUSE; ROSE LANE; ROSE LINN; ROSE MEADOW FARM; ROSE MOUNTAIN; ROSE OF SHARON MANOR; ROSE PERSONAL CARE; ROSE PETAL FALLS; ROSE SCHNITZER MANOR; ROSE TREE PLACE; ROSA VILLA; ROSE VILLA; ROSE VISTA; ROSECRANS; ROSECRANS VILLA; ROSEDALE GREEN; ROSEGATE; ROSEHAVEN; ROSEMARK; ROSEMONT; ROSE POINTE; ROSE ROCK; ROSE'S PLACE; ROSETTA; ROSEVIEW GARDENS; ROSEWALK; ROSEWALK VILLAGE; ROSEWAYNE; ROSEWIND HOUSE; ROSEWOOD (9 communities); ROSEWOOD COURT; ROSEWOOD MANOR; ROSEWOOD PARK; TENDER ROSE; THE ROSE (4 communities); THE ROSEMONT; THE WATERMARK AT ROSEWOOD GARDENS; TIERRA ROSE; VICTORY CENTRE OF ROSELAND; VILLA ROSA; VILLA ROSE; and WINDSOR ROSEWOOD.

The record includes the expert testimony of Jim Moore, president and founder of Moore Diversified Services, Inc., a consulting and market research firm specializing in the senior housing and health care industries; Mr. Moore has over 44 years of experience in the field, and has been involved in over 2,000 consulting engagements. Mr. Moore also serves, *inter alia*, as a Board member of the second largest public senior living company in the United States. He has conducted hundreds of senior consumer focus groups dealing with consumers' community selection and decision making process. He has written five published books and monthly columns and

newsletters in various printed publications. And, he recently received The Lifetime Achievement Award for Distinguished Service to the Senior Housing Industry by the American Seniors Housing Association (ASHA), the leading for-profit senior living trade association.

Mr. Moore testified that senior living communities across the United States "have a significant concentration of common/similar names," even though "a very large number of these communities with common/similar names encompass separate individual owner/operators that are not part of a consolidated or common business entity." (38 TTABVUE 7). Mr. Moore stated that the word "rose" is "commonly used as a naming convention for many senior living communities under different ownership." *Id.* According to Mr. Moore, "most of these communities [using 'ROSE'] have existed for a number of years," and he has "frequently observed many of these 'rose'-type names when conducting a competitive analysis in the field." (38 TTABVUE 42). Mr. Moore further testified that the adoption of "common/similar names like 'rose'" by different owners for senior living communities "is a very predominant trend and is an existing, accepted practice in the senior living industry." (38 TTABVUE 23). In this connection, Mr. Moore identified Exhibit 9, which lists common names used by different and unrelated senior living communities, including "Autumn," "Golden," "Heritage," "Spring," and "Willow." The list includes 76 senior living communities using "Rose" as part of their community names. (38 TTABVUE 22; 168-223).

In response to this evidence, Opposer asserts that "third-party registrations and internet evidence of third-party use are of limited probative value." More specifically, Opposer argues:

> These documents have little to no value because there is no evidence demonstrating the public has been so exposed to these alleged third-party uses of trade names or trademarks containing the words "rose" or "primrose" that they would ignore the elements of the marks at issue in this proceeding…Neither [Applicant] nor its expert have [sic] provided any testimony or other evidence from which the Board might gauge the consuming public's exposure to those third-party marks, marketplace penetration, or how extensive third-party sales have been under those marks. [Applicant] elected to not conduct any third-party discovery to ascertain sales, consumer recognition, and channels of trade for these third-parties. So there is no information from which the Board may place any significant value on this limited evidence of third-party use or registration.
> (70 TTABVUE 8-9).

In making its argument, however, Opposer fails to acknowledge, let alone address the recent pronouncements of the Federal Circuit regarding the probative value of this type of evidence. Although Applicant's evidence tells us little about the specific extent to which the third-party marks may have been used or the amount of exposure relevant customers may have had to them, the Federal Circuit has held that "even where the specific extent and impact of the usage has not been established," such evidence of third-party use is relevant to show that a term "may have a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that [term] is relatively weak," and "can show that customers have been educated to distinguish between different marks on the basis of minute distinctions." *Jack Wolfskin Ausrustung Fur Draussen GmbH v. New Millennium*

14

*Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015) (quoting *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015)). Indeed, in the words of the Federal Circuit, evidence of extensive use and registration of a term by others as a mark, as is the case here, can be "powerful on its face, even where the specific extent and impact of the usage has not been established." *Jack Wolfskin v. New Millennium Sports*, 116 USPQ2d at 1136 (internal quotes omitted). "The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection." *Juice Generation v. GS Enters.*, 115 USPQ2d at 1674. We find the evidence of third-party uses and registrations in the present case to be "powerful on its face," and accord this factor significant weight in the likelihood of confusion analysis.

James Thares, Opposer's founder and chief executive officer, confirmed that in at least five cases, Opposer did not pursue legal recourse, beyond sending cease and desist letters, against third-party users of PRIMROSE (such as, for example, the uses in Texas). (41 TTABVUE 280-302; Ex. 6). Opposer acted similarly with respect to certain of the other third-party users, that is, by sending a cease and desist letter with little to no follow-up action. These uses included the following: PRIMROSE ALZHEIMER'S LIVING (CA); and PRIMROSE HEALTHCARE SERVICES (MO).[7] Mr. Thares also acknowledged that Opposer chose to take no action whatsoever

---

[7] In two other instances (PRIMROSE PLACE in North Carolina and Wyoming), the respective user agreed to change its name, although Mr. Thares did not know whether or not the name change ever took place.

against various other third-party users of ROSE-formative marks, including where the uses have occurred in the same geographic areas in which Opposer operates. (41 TTABVUE 315-335). In fact, Mr. Thares testified that until this proceeding, Opposer did not "[make] efforts to enforce its own 'Primrose' mark against an entity that didn't have the word 'Primrose' in its name." (41 TTABVUE 301).

The testimony and evidence demonstrate that relevant customers have been exposed to so many different ROSE and ROSE-formative marks and names in connection with senior living communities that they likely have become alert to "minute distinctions" among the various marks. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d at 1691. As a result, a mark comprising, in whole or in part, the word "Rose" in connection with senior living community services should be given a restricted scope of protection. *See In re Broadway Chicken Inc.*, 38 USPQ2d 1559, 1565 (TTAB 1996) (multiple sources of use corroborate that third-party use is extensive). In other words, Opposer's mark PRIMROSE is not entitled to such a broad scope of protection that it is a bar to the registration of every mark comprising, in whole or in part, the word "Rose"; it will only bar the registration of marks "as to which the resemblance to [Opposer's mark] is striking enough to cause one seeing it to assume that there is some connection, association or sponsorship between the two." *Anthony's Pizza & Pasta Int'l Inc. v. Anthony's Pizza Holding Co.*, 95 USPQ2d 1271, 1278 (TTAB 2009), *aff'd,* 415 Fed. Appx. 222 (Fed. Cir. 2010) (quoting *Pizza Inn, Inc. v. Russo*, 221 USPQ 281, 283 (TTAB1983).

***Similarity of the Marks***

We must compare Opposer's mark PRIMROSE (in typed form) to Applicant's mark ROSE SENIOR LIVING (in standard character form) as to appearance, sound, connotation and commercial impression. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d at 1691 (Fed. Cir. 2005) (quoting *In re E. I. du Pont de Nemours & Co.*, 177 USPQ at 567). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (citation omitted).

Because the services are, in part, essentially identical, the degree of similarity between the marks necessary to find likelihood of confusion declines. *Bridgestone Americas Tire Operations LLC v. Federal Corp.*, 673 F.3d 1330, 102 USPQ2d 1061, 1064 (Fed. Cir. 2012); *Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1722; *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 1034 (1992).

Although marks must be considered in their entireties, it is settled that one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the mark's commercial impression. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("There is nothing improper in stating that, for rational reasons, more or less

weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable.").

With respect to Applicant's mark, the generic terminology "SENIOR LIVING" properly has been disclaimed apart from the mark. In view of the generic nature of this disclaimed terminology, it plays little role in the source-indicating function of Applicant's mark as a whole. *Id.* ("That a particular feature is descriptive or generic with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark[.]"). Accordingly, ROSE clearly is the dominant portion of Applicant's mark. *See, e.g., In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997) ("DELTA," not the disclaimed generic term "CAFE," is the dominant portion of the mark THE DELTA CAFE).

Although the words PRIMROSE and ROSE look and sound alike to the extent that ROSE is present in both marks, the marks are specifically different. *See Jack Wolfskin Ausrustung Fur Draussen GmbH v. New Millennium Sports, S.L.U.*, 116 USPQ2d at 1134-35. The initial element PRIM- in Opposer's mark is prominent and causes Opposer's mark to differ in appearance and sound from Applicant's mark.

With respect to meaning, each mark is the name of a flowering plant, albeit specifically different plants. A "primrose" is defined as "any of a genus (*Primula* of the family Primulaceae, the primrose family) of perennial herbs with large tufted basal leaves and showy variously colored flowers." (merriam-webster.com). The term "rose" means, in pertinent part, "any of a genus (*Rosa* of the family Rosaceae, the rose

18

family) of usually prickly shrubs with pinnate leaves and showy flowers having five petals in the wild state but being often double or partly double under cultivation; the flower of a rose." *Id*. Although Applicant argues that consumers will associate its mark "with the well-respected EDWARD ROSE & SONS name and mark" (68 TTABVUE 32), consumers are just as likely or even more likely to think of the flowering plant rather than a family name, especially given that Applicant's word mark, in actual use, often is accompanied by a rose flower design as shown below.



In this connection, Opposer also highlights the similarity of trade dress, as shown below.



As our primary reviewing court has stated:

> Ordinarily, for a word mark we do not look to the trade dress, which can be changed at any time. *Vornado, Inc. v. Breuer Electric Mfg. Co.*, 390 F.2d 724, 156 USPQ 340, 342 (CCPA 1968). But the trade dress may nevertheless provide evidence of whether the word mark projects a confusingly similar commercial impression.

*Kenner Parker Toys Inc. v. Rose Art Indus. Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1458 (Fed. Cir. 1992). *See Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d

669, 223 USPQ 1281, 1284 (Fed. Cir. 1984). In the present case, the parties use a similar rose color for their marks, and both PRIMROSE and ROSE are accompanied by pictorial representations of flowers, albeit flowers having different appearances. Thus, the flower designs reinforce the meanings of the words PRIMROSE and ROSE themselves, although we reiterate that a primrose and a rose are specifically different plants.

In sum, although there are similarities between the marks, the marks are specifically different in sound, appearance and meaning. When viewed against the background of significant third-party uses and registrations as discussed above, these differences outweigh the similarities, resulting in different overall commercial impressions. We find that this factor weighs in favor of a finding of no likelihood of confusion.[8]

### Conditions of Sale/Sophistication of Consumers

Applicant contends that consumers of senior living community services are sophisticated and knowledgeable, that they exercise a high degree of care in choosing a senior living community, and that they do not purchase the services on impulse or a whim. According to Pamela Klingfus, the regional director of Ecumen, a non-profit organization that operates a variety of senior housing options and services,

---

[8] Applicant points out that when its application was examined, the Examining Attorney did not cite Opposer's registered mark as a bar under Section 2(d); and that when Opposer's recently filed application (Serial No. 86504871 for the mark PRIMROSE in standard characters for a variety of services featuring senior living communities in four classes) was examined, Applicant's earlier-filed application was not cited as a potential bar under Section 2(d). Suffice it to say that the Board is not bound by examination actions taken (or not taken) by an examining attorney. *See, e.g.*, *Super Bakery Inc. v. Benedict*, 96 USPQ2d 1134, 1135 n.1 (TTAB 2010).

consumers for such services are sophisticated and knowledgeable when it comes to researching and selecting a senior living community. This process takes place "over a significant period of time," with consumers carefully evaluating their options and making educated decisions before selecting a community. The decision to move to a senior living community "is a very important one that often involves where a senior will live for the rest of his or her life, and consumers take the decision very seriously." (34 TTABVUE 6-7). Dena Meyer, the senior director of business development at the same entity, indicated that "consumers conduct substantial research and take great care before selecting a particular senior living community," with it "typically tak[ing] eight to ten contacts with a senior living community for consumers to make a decision to move into that community." Further, "the process is not quick unless there is an absolute need to move immediately, which happens very rarely; [e]ven then, the decision is one made with thought and care because of the exigent circumstances and involved costs." (36 TTABVUE 6).

Mr. Moore opines that "seniors and their families conduct significant research over a substantial amount of time and make educated, pragmatic decisions," and that "prior to making the final decision, seniors and their adult children are sophisticated, knowledgeable consumers who exercise a high degree of care in the final selection of a senior living community." (38 TTABVUE 7). The process of selecting and moving into a senior living community "can take a substantial amount of time," and "unless there is a significant medical need, the decision to join a senior living community typically takes a great deal of time …. that can span a number of months and as

much as several years …. [D]ecision delay – 'I'm not quite ready yet' – is a common challenge and often extends or delays the process even more." (38 TTABVUE 11). Recent studies show that prospects shopped an average of three communities in detail before making their selection. (38 TTABVUE 12). According to Mr. Moore, "[b]y the time a formal decision is made, most of these consumers are well qualified to make objective, sophisticated, and informed decisions about the value of one senior living community versus another. Seniors and their families recognize that the consideration to move to a senior living community is a very important, one-time decision and for most, is their largest lifetime expenditure. Seniors do not make quick, uninformed senior living decisions. They are sophisticated and informed consumers making significant decisions concerning possibly their largest lifetime expenditure." (38 TTABVUE 13-14).

Mr. Thares gave Opposer's perspective on this factor, similarly indicating that prospective purchasers "do their research before making this decision" (41 TTABVUE 268), and that "clients shopping for assisted living services take great care in selecting the facility." (41 TTABVUE 308).

The decision regarding a senior living community is a serious one, often a once-in-a-lifetime choice, and one that is relatively expensive; depending on the services needed, industry average costs are in the tens of thousands of dollars annually. Thus, we find that generally these decisions are made with significant thought and deliberation, resulting in a careful purchase. We also appreciate, however, that the record shows some purchasers may make these decisions hastily and under duress.

22

Melissa O'Hara, Opposer's Director of Sales and Marketing, testified that while some purchasers move into these types of senior living facilities after lengthy deliberations, others move in quickly "after days or even hours of consideration," especially those purchasers "with sudden health issues or life events that necessitate a quick decision about where to move." (22 TTABVUE 85). Nevertheless, on balance, given the nature of the services and the high costs associated therewith, the conditions of sale favor a finding of no likelihood of confusion.

Insofar as sophistication of purchasers is concerned, choices among various senior living options are made by families and people in all walks of life, at all levels of education and income. We must therefore presume that Opposer's and Applicant's services are offered to both sophisticated and unsophisticated consumers, and that their purchasing decisions, as noted above, range from thoughtful to hasty. Accordingly, the applicable standard of care for the likelihood of confusion analysis is that of the least sophisticated consumer. *Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, 110 USPQ2d at 1163 (affirming that TTAB properly considered all potential investors for recited services, which included sophisticated investors, but that precedent requires consumer care for likelihood-of-confusion decision to be based "on the least sophisticated potential purchasers"); *see also Fiserv, Inc. v. Elec. Transaction Sys. Corp.*, 113 USPQ2d 1913, 1921-22 (TTAB 2015).

We find that even in the case of the least sophisticated purchaser, a decision as important as choosing a senior living community will be made with some thought and

research, even when made hastily. Accordingly, we find that this *du Pont* factor weighs in favor of finding no likelihood of confusion.

***Actual Confusion***

Applicant's assertion, confirmed by Opposer, that the parties are unaware of any instances of actual confusion between the marks is entitled to very little weight. First, it is not necessary to show actual confusion in order to establish likelihood of confusion. *Herbko Int'l Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. (2002); *Weiss Associates, Inc. v. HRL Associates, Inc.*, 902 F.2d 1546, 14 USPQ2d 1840, 1842-43 (Fed. Cir. 1990), *aff'g HRL Associates, Inc. v. Weiss Associates, Inc.*, 12 USPQ2d 1819 (TTAB 1989). Second, the marks have been in contemporaneous use for only a short time, since 2013. Thus, the opportunity for actual confusion to have occurred in the marketplace is minimal. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1847 (Fed. Cir. 2000). Accordingly, the eighth *du Pont* factor, the length of time during and conditions under which there has been contemporaneous use of the marks without evidence of actual confusion, is neutral.

***Conclusion***

We have considered all of the evidence made of record pertaining to the likelihood of confusion issue, as well as all of the arguments related thereto, including any evidence and/or arguments not specifically discussed in this opinion. We find that the number of third-party uses of PRIMROSE, ROSE and ROSE-formative marks in the senior living community industry, and the conditions of sale entailed by the selection

24

of a senior living community, are factors entitled to significant weight in our likelihood of confusion analysis. These factors, coupled with differences between the marks, outweigh the overlap of the services. Opposer has the burden of proof and must establish its likelihood of confusion claim by a preponderance of the evidence, and we see Opposer's likelihood of confusion claim as amounting to only a speculative, theoretical possibility. Language by our primary reviewing court is helpful in resolving the likelihood of confusion issue in this case:

> We are not concerned with mere theoretical possibilities of confusion, deception, or mistake or with de minimis situations but with the practicalities of the commercial world, with which the trademark laws deal.

*Electronic Design & Sales Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 21 USPQ2d 1388, 1391 (Fed. Cir. 1992), citing *Witco Chemical Co. v. Whitfield Chemical Co., Inc.*, 418 F.2d 1403, 1405, 164 USPQ 43, 44-45 (CCPA 1969), *aff'g* 153 USPQ 412 (TTAB 1967).

We conclude that consumers familiar with Opposer's services of "providing congregate, independent, and assisted living facilities" rendered under the mark PRIMROSE are *not* likely to mistakenly believe, upon encountering Applicant's mark ROSE SENIOR LIVING for "rental of apartments; rental of residential housing; management of senior housing communities" (in International Class 36); "retirement homes; providing assisted living facilities; providing assisted living facilities for Alzheimer and dementia clients" (in International Class 43); and "nursing home services; managed health care services" (in International Class 44), that the services originate from or are associated with or sponsored by the same entity.

**Decision:** The opposition is dismissed.