This Opinion is a
Precedent of the TTAB

Hearing: February 17, 2022                           Mailed: September 28, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*ARSA Distributing, Inc.*
*v.*
*Salud Natural Mexicana S.A. de C.V.*

_____

Opposition No. 91240240 (parent)
Opposition No. 91243700

_____

Christine Lebrón-Dykeman and Mike Gilchrist of McKee Voorhees & Sease P.L.C.
    for ARSA Distributing, Inc.

Jeffrey M. Furr of Furr Law Firm
    for Salud Natural Mexicana S.A. de C.V.

_____

Before Taylor, Greenbaum and English, Administrative Trademark Judges.

Opinion by English, Administrative Trademark Judge:

Salud Natural Mexicana S.A. de C.V. ("Applicant" or "Salud") seeks registration

on the Principal Register of the standard character mark EUCALIN for

"pharmaceutical products, namely, vitamin supplements, nutritional supplement

made with a syrup with jelly base, honey base, and with a mixture of plants with

propolis base, and herbal remedies in the nature of herbal supplements"[1] in International Class 5, and the composite mark set forth below for "herbal supplements; nutritional supplements; vitamin supplements" in International Class 5.[2]



---

[1] Application Serial No. 86779422, was filed on October 6, 2015 under Section 44(e) of the Trademark Act, 15 U.S.C. § 1126(e), based on Mexican Registration No. 701995, registered March 9, 2001. The application includes the following translation statement: "The wording 'EUCALIN' has no meaning in a foreign language."

[2] Application Serial No. 87638836, was filed on October 9, 2017 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on an allegation of an intent to use the mark in commerce. The application includes the following translation statement: "The wording 'EUCALIN' has no meaning in a foreign language." The application also includes the following description of the mark and color claim:

> The mark consists: the word 'EUCALIN' stylized in different colors, the letters 'E', 'U', and 'C' in orange colored with brown color, the letter 'A' in brown color, the letters 'L', 'I' and 'N' in darker brown, the letter 'I' with a graphic accent, on the underside a bee in yellow and black color on a yellow and brown honeycomb, under the honeycomb, a branch of eucalyptus in green color with berries in brown color, surrounded by some white with gray bubbles, a green and white background in several shades.

> The color(s) green, white, brown, black, gray, yellow, and orange is/are claimed as a feature of the mark.

In its notices of opposition, ARSA Distributing, Inc. ("Opposer" or "Arsa"), alleges prior common law use of the mark EUCALIN for "dietary and nutritional supplements" and that the Office suspended its application for the EUCALIN mark based on a potential likelihood of confusion with the marks subject to Applicant's involved applications.[3] Opposer alleges likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), as the ground for each opposition.

In its operative answers, Applicant makes a few admissions that we discuss in this opinion to the extent pertinent.[4] Applicant otherwise denies the salient allegations in the notices of opposition.

The oppositions were previously consolidated and tried on the same record. An oral hearing was held on February 17, 2022. For the reasons explained below, we dismiss the oppositions.

---

[3] Opposition No. 91240240 (the "'240 Opposition"), 1 TTABVUE 4, ¶¶ 3-4; Opposition No. 91243700 (the "'700 Opposition"), 1 TTABVUE 4, ¶¶ 3, 5, 6.

ARSA is spelled in all capital letters in the notices of opposition, but in their briefs, the parties refer to Arsa with only an initial capital letter so for the remainder of the decision we do the same.

Citations to TTABVUE are to the Board's public online database that contains the opposition files, available on the USPTO website, www.USPTO.gov. The first number represents the docket number in the TTABVUE electronic case file and the second represents the page number(s), if applicable. Unless otherwise noted, all citations are to the record in the '240 Opposition, which is the parent proceeding.

[4] '240 Opposition, 32 TTABVUE; '700 Opposition, 4 TTABVUE.

In addition, Applicant pleaded an affirmative defense of unclean hands in the '240 Opposition only.

## I.    Objections and Evidentiary Record

### A. Applicant's Objection to the Trial Declaration of Rossana Arras

Applicant seeks to exclude the May 7, 2021 trial declaration of Rossana Arras[5] on the ground that "Ms. Arras is a Spanish speaker and the trial declaration that she signed was completely in English [so] she is not competent to know what she was signing in the trial declaration and if those statements and the evidence associated with them were true."[6] In support of this position, Applicant submitted: (1) the trial declaration of its attorney Jeffrey Furr attaching a January 15, 2019 email from Opposer's counsel, Christine Lebrón-Dykeman, who represented that Applicant would "need a translator" for Ms. Arras' discovery deposition "as Ms. Arras is a Spanish speaker";[7] and (2) portions of the discovery deposition of Ms. Arras reflecting that the deposition was "given through an interpreter[.]"[8]

Opposer does not argue the merits of Applicant's objection but rather asserts that exclusion of the testimony would not be "determinative of the issues in this case as there are two additional witnesses … who provided Trial Testimony" for Opposer.[9]

The record supports that Ms. Arras is not an English speaker. And opposer did not object to the exclusion of her testimony, instead pointing to the testimony of additional witnesses. As Opposer concedes, a certified and signed translation should

---

[5] Rossana Arras Declaration, 54 TTABVUE (redacted); 55 TTABVUE (confidential).

[6] Applicant's Brief, 77 TTABVUE 8.

[7] 71 TTABVUE 5, 7, ¶ 3 and Exhibit A.

[8] 70 TTABVUE 5-6.

[9] 78 TTABVUE 6, n.1.

have been, but "was inadvertently not[,] filed with Arsa's Notice of Reliance."[10] *See Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at \*1 n.1 (TTAB 2019) (noting that petitioner provided testimony declarations with translations from Spanish to English); *cf. Int'l Dairy Foods Assoc. v. Interprofession du Gruyère*, 2020 USPQ2d 10892, at \*7-8 (TTAB 2020) (giving no consideration to evidence consisting of documents in whole or in part in a foreign language without an English translation). Accordingly, Applicant's objection is **sustained**.

We give no consideration to Rossana Arras' trial declaration or exhibits thereto, with the exception that we have considered: (1) the first page of Exhibit A (54 TTABVUE 11) consisting of a July 25, 2017 partial TSDR record for Opposer's now-cancelled Registration No. 3912708 for the standard character mark EUCALIN[11] because it is an official record that would have been admissible under a notice of reliance, Trademark Rule 2.122(e)(1), 37 C.F.R. § 2.122(e)(1);[12] and (2) Exhibit E (54 TTABVUE 26-30) consisting of a printout from Amazon.com bearing a complete URL address and date because this document would have been admissible under notice of reliance as a printed publication. Trademark Rule 2.122(e)(2).

---

[10] 78 TTABVUE 6, n.1.

[11] The registration was cancelled effective February 2, 2017 due to Opposer's failure to file a Section 8 affidavit, 15 U.S.C. § 1058. 62 TTABVUE 4-6. *Land O Lakes, Inc. v. Hugunin,* 88 USPQ2d 1957, 1959 (TTAB 2008) ("Inasmuch as applicant did not file any paper to maintain his registration, his rights in the prior registration were extinguished on the day after its sixth anniversary date.").

[12] 54 TTABVUE 11. *STX Financing, LLC v. Terrazas,* 2020 USPQ2d 10989, at \*2 (TTAB 2020) ("The file history of an application, or a portion thereof, may be submitted under notice of reliance as an official record under Trademark Rule 2.122(e)(1)."); *Weyerhaeuser Co. v. Katz,* 24 USPQ2d 1230, 1231 n.1 (TTAB 1992) (copy of drawing from abandoned application admissible under notice of reliance).

**B. Applicant's Renewed Objection to Opposer's Designation of Certain Material as "Attorneys' Eyes Only" under the Standard Protective Order**

Applicant also renews its August 26, 2020 motion asserting that Opposer has improperly designated its responses to Interrogatory Nos. 1-4 as Confidential Attorneys' Eyes Only under the Standard Protective Order ("SPO") that is automatically applicable in this proceeding.[13] Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g). Applicant argues the "designation [is] not appropriate and deals with potential wrong doing [sic] by third parties and the Opposer which Applicant's Attorney believes that he has an ethical obligation to disclose to the Applicant."[14]

Opposer opposes the motion arguing that Applicant did not make a good faith effort to resolve this dispute before filing its motion and that "the identity of Arsa's manufacturer meets both necessary elements for designation as a trade secret under the … Uniform Trade Secret Act" of Texas, the state in which Opposer is "incorporated and resides."[15]

---

[13] Applicant's Motion, 41 TTABVUE (objecting to confidentiality designation); January 29, 2021 Order, 46 TTABVUE 16, n.15 (denying Applicant's motion "without prejudice to renewal at final hearing"); Applicant's Brief, 77 TTABVUE 11 (renewing motion).

Applicant filed two redacted copies of its motion. We cite the later-filed redacted motion at 41 TTABVUE.

[14] Applicant's Brief, 77 TTABVUE 11.

[15] Opposer's Response to Motion, 42 TTABVUE 4 (improperly designated confidential) (incorporated by reference into Opposer's Rebuttal Brief at 79 TTABVUE 14, also improperly designated confidential). *See* Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party.").

Opposer further argues that Applicant's "renewed challenge should be denied" because Applicant "proffered no new arguments as to why this information should not be maintained as Attorney's Eyes-Only material; it simply reiterates and rehashes the arguments made in the original motion." Opposer's Rebuttal Brief, 79 TTABVUE 14 (confidential). This

As to Opposer's first argument, Applicant attached to its motion copies of emails between the parties' counsel in which Applicant attempted to address Opposer's confidentiality designations. These emails demonstrate that Applicant made a good faith attempt to resolve the confidentiality dispute before filing its motion.[16]

As to Opposer's second argument, we need not consider whether the identity of the entities manufacturing and packaging Opposer's goods rises to the level of a "trade secret" under the Texas Trade Secret Act because, under the Board's standard protective order, information may be designated "Attorneys' Eyes Only" if it is a "trade secret" **or** other "commercially sensitive" information that a party seeks to protect, such as "sensitive information including current research, development and manufacturing information."[17]

We now consider whether Opposer's AEO designations are appropriate. The interrogatories at issue are as follows:[18]

> INTERROGATORY NO. 1: Identify who produced the products sold by Opposer under the EUCALIN mark, the products they produced for the Opposer, the number of products they produced for the Opposer and the amount paid to them by Opposer for each product for each year from 2008 until the present?

---

argument, also improperly filed under seal, is without merit. In its January 29, 2021 Order, the Board did not determine the merits of Applicant's motion but denied the motion "without prejudice to renewal at final hearing." 46 TTABVUE 16, n.15. Accordingly, Applicant was permitted to renew its earlier arguments.

[16] The SPO provides that if there is a dispute over a confidentiality designation, the parties must "negotiate in good faith" to attempt to resolve the dispute. https://www.uspto.gov/sites/default/files/documents/Standard%20Protective%20Order_0205 2020.pdf (Terms of Order, ¶ 14).

[17] SPO, Terms of Order, ¶ 1.

[18] Opposer's Motion, 41 TTABVUE 15-18.

INTERROGATORY NO. 2: Identify who produced the packaging for the goods sold under the EUCALIN mark for each year from 2008 until the present?

INTERROGATORY NO. 3: Has ARSA at any time manufacture[d] the syrup sold under the EUCALIN mark?

INTERROGATORY NO. 4: Has ARSA at any time manufacture[d] any goods sold under the EUCALIN mark?

In response to Interrogatory No. 1, Opposer identified how it presently manufactures EUCALIN products and the entities who "ha[ve] produced products."[19] Similarly, in response to Interrogatory No. 2, Opposer identified how it presently sources packaging for its EUCALIN products as well as the entities "that originally … produced the syrup with the packaging and labels."[20]

As discussed below, the entities that manufactured EUCALIN products and packaging for Opposer prior to 2017 are identified in two publicly-available legal opinions issued by the Mexican Institute of Industrial Property.[21] Applicant filed translated copies of these documents that are publicly accessible at 60 and 61 TTABVUE, without objection from Opposer. Accordingly, this information is not eligible for protection under any tier of confidentiality in the SPO.[22] We find, however, that the remainder of Opposer's responses to Interrogatory Nos. 1 and 2 comprise

---

[19] 39 TTABVUE 17 (confidential). We do not consider this portion of Opposer's interrogatory response confidential so we do not treat it as such. Trademark Rule 2.116(g).

[20] 39 TTABVUE 17 (confidential). We likewise do not consider this portion of Opposer's interrogatory response confidential so we do not treat it as such. Trademark Rule 2.116(g).

[21] 60 TTABVUE; 61 TTABVUE.

[22] SPO, Terms of Order, ¶ 2 ("Information may not be designated as subject to any form of protection if it … is, or becomes, public knowledge, as shown by publicly available writings, other than through violation of the terms of this Order[.]").

"commercially sensitive" information properly designated "Attorneys' Eyes Only." We further find that Opposer appropriately designated its responses to Interrogatory Nos. 3 and 4 as "Attorneys' Eyes Only."

As to Applicant's counsel's "belie[f] that he has an ethical obligation to disclose to the Applicant" Opposer's responses to Interrogatory Nos. 1-4, we recognize that attorneys have ethical obligations to clients but Applicant has not cited any rule that such an ethical obligation is an exception to an attorney's obligation under the SPO to protect information properly designated as "Attorneys' Eyes Only." Moreover, the SPO provides that "[d]isclosure of information protected under the terms of this Order is intended to facilitate the prosecution or defense of **this Board proceeding**."[23] Accordingly, Applicant's attorney is obliged to comply with the SPO to the extent Opposer has properly identified information as "Attorneys' Eyes Only."[24]

In view of the foregoing, Applicant's motion is **granted, in part**, to the extent that within **thirty days** of the date of this opinion, Opposer must remove the "Attorneys' Eyes Only" designations with respect to the entities who "ha[ve] produced products" prior to 2017 (response to Interrogatory No. 1) and the entities "that originally … produced the syrup with the packaging and labels" (response to

---

[23] SPO, Terms of Order, ¶ 11 (emphasis added).

[24] The Board takes no position as to whether the SPO establishes contractual rights or is enforceable outside of these consolidated proceedings. Such issues are for the appropriate judicial forum to decide. SPO, Introductory Paragraph (noting that it "may be desirable to" exchange signed copies of the SPO but that enforceability of the SPO outside of the Board proceeding is not for the Board to decide).

Interrogatory No. 2). *See* Section IV. below (reiterating this requirement and setting out consequences for noncompliance). Applicant's motion is otherwise **denied**.

## C. Evidentiary Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), Applicant's involved applications. The parties also introduced evidence during trial.

Opposer's evidence consists of:

1. Opposer's Notice of Reliance on:[25]

- the Trademark Status and Document Retrieval ("TSDR") database record and portions of the file history for Opposer's pleaded application Serial No. 87778409;[26]

- TSDR database records and portions of the file histories for previously-abandoned applications owned by Applicant for marks consisting of or incorporating the term EUCALIN;[27]

- Applicant's admissions to Opposer's Requests for Admission Nos. 1-14;[28] and

- Applicant's responses to Opposer's Interrogatory Nos. 2, 3, and 4;[29]

---

[25] Opposer also introduced TSDR records and portions of the file histories for Applicant's involved applications and the operative pleadings in these consolidated proceedings. 51 TTABVUE 32-55; 111-154; 52 TTABVUE (Applicant's confidential answer). This was unnecessary as these documents are automatically of record. Trademark Rule 2.122(b)(1); *Poly-Am., L.P. v. Ill. Tool Works Inc.*, 124 USPQ2d 1508, 1510 (TTAB 2017) (record automatically includes pleadings (excluding exhibits not admissible with the complaint under Trademark Rule 2.122(d)) and involved applications or registrations).

[26] 51 TTABVUE 8-31.

[27] *Id.* at 56-95.

[28] *Id.* at 96-101.

[29] *Id.* at 102-110.

2. Trial Declaration of Sergio Arras, prior shareholder and manager for Opposer from June 2008 to January 2011;[30]

3. Trial Declaration, and accompanying exhibits, of Yesenia Medrano, sales representative for Opposer;[31] and

4. Certain exhibits attached to the excluded trial declaration of Rossana Arras, as described in Section 1.A above.[32]

Applicant introduced the following evidence:

1. Applicant's first Notice of Reliance on a docket sheet from TTABVUE, the Board's electronic docketing system, for Cancellation No. 92064070;[33]

2. Applicant's second Notice of Reliance on "a printout of the public records and a signed translation of a public document finding of infringement by [the] MEXICAN INSTITUTE OF INDUSTRIAL PROPERTY DIVISIONAL DIRECTORATE FOR INTELLECTUAL PROPERTY against the company Nayec [of] its rights to the EUCALIN mark";[34]

3. Applicant's third Notice of Reliance on "a printout of the public records and a signed translation of a public document finding of infringement by [the] MEXICAN INSTITUTE OF INDUSTRIAL PROPERTY DIVISIONAL DIRECTORATE FOR INTELLECTUAL PROPERTY against Empacadora Therbal of its rights to the EUCALIN mark";[35]

4. Applicant's fourth Notice of Reliance on the TSDR database record for and portions of the file history from Opposer's now-cancelled Registration No. 3912708 for the standard character mark EUCALIN;[36]

---

[30] 53 TTABVUE.

[31] 56 TTABVUE (redacted); 57 TTABVUE (confidential).

[32] 54 TTABVUE 11, 26-30.

[33] 59 TTABVUE. The pleaded ground for cancellation is not of record. As discussed below, however, this was a cancellation action brought by Applicant against Opposer's Reg. 3912708 for the standard character mark EUCALIN. The proceeding was terminated after Reg. No. 3912708 was administratively cancelled for Opposer's failure to file the required maintenance documents. 62 TTABVUE 4; *see also* 59 TTABVUE 4.

[34] 60 TTABVUE.

[35] 61 TTABVUE.

[36] 62 TTABVUE. Applicant unnecessarily attached two copies of the documents to its notice of reliance.

5. Applicant's fifth and sixth Notices of Reliance on Opposer's supplemental partial responses to Applicant's first set of Interrogatories[37] and verification of those responses;[38]

6. Applicant's seventh Notice of Reliance on English translations for two Mexican trademark registration certificates in Applicant's name and accompanying certification from the translator;[39]

7. Applicant's eighth Notice of Reliance on a May 22, 2015 letter from the U.S. Treasury Department to Applicant's attorney;[40]

8. Applicant's ninth Notice of Reliance on portions of the March 1, 2019 discovery deposition of Rossana Arras;[41]

9. Trial Declaration, and accompanying exhibits, of Luis Alfonso Tirado Diaz, Sole Administrator for Applicant;[42]

10. Trial Declaration, and accompanying exhibit, of Applicant's attorney, Jeffrey Furr;[43] and

11. Trial Deposition of Yesenia Medrano, taken July 27, 2021.[44]

## II. Entitlement to a Statutory Cause of Action

Opposer must demonstrate that it is entitled to bring a statutory cause of action

against Applicant. *See Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC,*

---

[37] 64 TTABVUE (confidential); 65 TTABVUE (redacted).

[38] 66 TTABVUE. The verification, signed by Rossana Arras, is in English and no signed translation is of record so we give the verification no consideration for the reasons explained in Section I.A. above.

[39] 67 TTABVUE.

[40] 69 TTABVUE.

[41] 70 TTABVUE.

[42] 68 TTABVUE. Applicant improperly filed the declaration under a notice of reliance but the error is harmless. *See, e.g., Ricardo Media Inc. v. Inventive Software, LLC,* 2019 USPQ2d 311355, at *2-3 (TTAB 2019); *WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.,* 126 USPQ2d 1034, 1037 (TTAB 2018).

[43] 71 TTABVUE. This declaration also was improperly submitted under notice of reliance but again the error is harmless.

[44] 73 TTABVUE.

965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067 n.4 (2014)). Specifically, Opposer must prove that these consolidated opposition proceedings are within its zone of interests protected by the statute, 15 U.S.C. § 1063, and that it has a reasonable belief in damage proximately caused by registration of the marks, i.e., that it is not a mere intermeddler. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied,* 141 S. Ct. 2671 (2021).

Opposer introduced a printout from the USPTO's Trademark Status and Document Retrieval (TSDR) database and a copy of a suspension notice from the USPTO demonstrating that Opposer's pleaded application Serial No. 87778409 for the standard character mark EUCALIN has been suspended pending a potential refusal under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), based on a likelihood of confusion with Applicant's involved marks.[45] This evidence is sufficient to demonstrate Opposer's entitlement to a statutory cause of action. *See, e.g.*, *Nextel Commc'ns, Inc. v. Motorola, Inc.,* 91 USPQ2d 1393, 1400 (TTAB 2009); *Life Zone Inc. v. Middleman Grp. Inc.,* 87 USPQ2d 1953, 1959 (TTAB 2008) ("Opposer's evidence of its pending trademark application, and evidence that the application has been suspended pending resolution of the subject application demonstrate that opposer has a reasonable belief that it would be damaged by registration of applicant's mark, thus establishing [entitlement].").

---

[45] 51 TTABVUE 18-31.

## III.   Priority

### A. Applicable Law

Section 2(d) of the Trademark Act prohibits the registration of a mark that "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1052(d). For purposes of priority, "proprietary rights may arise from a prior registration, prior trademark or service mark use, prior use as a trade name, prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights." *Herbko Int'l Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002).

Opposer relies for priority purposes on common law rights in the mark EUCALIN for "dietary and nutritional supplements." To establish prior common law rights, Opposer must prove by a preponderance of the evidence that its pleaded EUCALIN mark is distinctive, inherently or otherwise, and that it used the EUCALIN mark prior to Applicant's actual first use or constructive first use dates.[46] *See DeVivo v. Ortiz*, 2020 USPQ2d 10153, at *3 (TTAB 2020); *Exec. Coach Builders, Inc. v. SPV Coach Co.,* 123 USPQ2d 1175, 1180 (TTAB 2017) ("[B]ecause unregistered marks are not entitled to the presumptions established under Trademark Act Section 7(b)-(c), it

---

[46] The parties do not dispute and we agree based on the record before us that the mark EUCALIN is inherently distinctive for "dietary and nutritional supplements."

is Opposer's burden to demonstrate that it owns a trademark that was used prior to Applicant's first use or constructive use of its mark and not abandoned.") (citing *Life Zone v. Middleman Grp.,* 87 USPQ2d at 1959). In assessing whether Opposer has established priority, we consider the evidence of record as a whole. *W. Fla. Seafood, Inc. v. Jet Rests., Inc.,* 31 F.3d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994) ("[O]ne should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use.").

### B. Parties' Arguments

Opposer argues that "[t]he ongoing sales and advertising by Arsa of its EUCALIN product from 2008 to October 6, 2015 and October 9, 2017 establish that Arsa has used its EUCALIN mark long before the constructive use filing dates of both the '422 and '836 Applications, and thus Arsa has priority of use of the EUCALIN mark on nutritional and dietary supplements."[47]

Applicant counters that it has priority in the EUCALIN mark based on use since 1999. Specifically, Applicant asserts that between 1999 and October 2008 Opposer was its U.S. distributor and, therefore, "all of the goodwill of any EUCALIN labeled product went to the Applicant as the supplier of the goods and products."[48]

In reply, Opposer asserts that there was no distribution agreement between the parties but even if Applicant "could have reasonably claimed rights based on some alleged distribution agreement before 2008" Applicant "has long since abandoned any

---

[47] Opposer's Brief, 75 TTABVUE 21.

[48] Applicant's Brief, 77 TTABVUE 19; *see also id.* at 20-23.

rights it would have had[.]"[49] Specifically, Opposer asserts that: (1) on October 2, 2008, Applicant was "declared a Specially Designated Narcotics Trafficker" ("SDNT") and was "legally banned from conducting business in the United States until May 2015" when Applicant was removed from the SDNT list; and (2) Applicant "failed to produce any testimony or documentation establishing that [it] had concrete plans … of intent to resume use between 2008 and 2015[.]"[50]

Applicant admits that it was prohibited from doing business in the United States from October 2008 to May 2015 as a sanction, but asserts that it did not abandon the EUCALIN mark because: (1) Opposer's use, as a distributor, would still inure to its benefit; and, in the alternative, (2) the nonuse was excusable as Applicant "affirmably did what it could do to protect its rights to the EUCALIN mark in the United States."[51]

## C. Factual Findings

Opposer was formed in September 1999 and that same year started promoting and selling "dietary and nutritional supplements, including cough syrup" in the United States under the EUCALIN mark in the following format: .[52] As set out on the product packaging below, the products were manufactured by

[49] Opposer's Brief, 75 TTABVUE 22.

[50] Id. at 18, 23.

[51] Applicant's Brief, 77 TTABVUE 24, 32.

[52] Sergio Arras Declaration, 53 TTABVUE 2-3, ¶¶ 3, 6; Rossana Arras Discovery Deposition, 70 TTABVUE 10-11. Sergio Arras testified that Rossana Arras managed Opposer from 2002 to 2007 and acquired Opposer in its entirety in 2011. Sergio Arras Declaration, 53 TTABVUE 2-3, ¶¶ 3-4.

Applicant in Mexico and distributed by Opposer in the United States (red arrows

added by the Board).[53]



---

[53] Sergio Arras Declaration, 53 TTABVUE 3-4, ¶¶ 7, 15. The text highlighted by the red arrows reads: "Made in Mexico by Salud Natural" and "Distributed by ARSA."

There is conflicting testimony regarding whether there was a distribution agreement between the parties.[54] Accordingly, we find that there was no clear agreement between the parties.

Applicant created the EUCALIN mark and product formulation and "manage[d] the products … under the name EUCALIN" while Opposer was the exclusive U.S. distributor for EUCALIN products, responsible "for building up the EUCALIN business in the United States[.]"[55] Opposer "solicited its own customers, and maintained those relationships"; Applicant "never told Arsa who to solicit as customers, never spoke directly with any of Arsa's customers, never visited Arsa's customers, and never interacted directly with Arsa's customers."[56] Applicant did not "set out any rules or restrictions regarding Arsa's sales or promotions of products," such as minimum sales requirements or marketing budgets.[57] Nor did Applicant "pay for any marketing done by Arsa" or take back any unsold or returned products.[58] Opposer fielded customer inquiries and complaints as only Opposer's telephone number and website address were printed on the product packaging.[59]

On October 2, 2008, Applicant was banned from doing business in the United States when the U.S. Treasury Department, Office of Foreign Assets Control

---

[54] Díaz Declaration, 68 TTABVUE 5, ¶ 4; Sergio Arras Declaration, 53 TTABVUE at 3, ¶ 8.

[55] Rossana Arras Discovery Deposition, 70 TTABVUE 10-11; Sergio Arras Declaration, 53 TTABVUE 3-5, ¶¶ 7-9, 12, 19.

[56] Sergio Arras Declaration, 53 TTABVUE 3, at ¶ 11.

[57] *Id.* at 4, ¶ 13.

[58] *Id.* at ¶¶ 13-14.

[59] *Id.* at ¶¶ 14-15.

("OFAC"), designated Applicant as a SDNT under the Kingpin Act.[60] With Applicant sidelined, Opposer secured a new manufacturer for EUCALIN products to maintain "ongoing customer relationships."[61] Because Opposer was not privy to the formula for EUCALIN products, the new manufacturer developed a new product for Opposer to sell in the United States starting in late 2008.[62] Also, on October 22, 2008, Opposer filed a U.S. trademark application for the standard character mark EUCALIN for "dietary and nutritional supplements" which matured into Registration No. 3912708.[63]

On May 22, 2015, the OFAC removed Applicant from the SDNT list, thus lifting the ban on Applicant conducting business in the United States and unblocking Applicant's property interests in the United States.[64] Thereafter, on:

- October 6, 2015, Applicant filed the involved application for the standard character mark EUCALIN;

---

[60] '240 Opposition, 1 TTABVUE 4-5, ¶¶ 12-13; 32 TTABVUE 3, ¶¶ 12-13; '700 Opposition, 1 TTABVUE 6, ¶ 22; 4 TTABVUE 4, ¶ 22.

As a result of being designated a SDNT under the Kingpin Act, Applicant's "property and interests in property within the United States" were blocked while the sanctions were in effect. 21 U.S.C. § 1904(b).

[61] Sergio Arras Declaration, 53 TTABVUE 5, ¶ 18.

[62] *Id.* at ¶¶ 19, 21 (Mr. Arras does not testify as to when precisely Opposer started selling a new product under the EUCALIN mark but he avers that it was in 2008 after sanctions were imposed on Applicant).

[63] *Id.* at ¶ 17; 62 TTABVUE 4-6. This registration was cancelled. *See* n.11, supra.

[64] '240 Opposition, 1 TTABVUE 4-5, ¶¶ 11-13; 32 TTABVUE 3, ¶¶ 11-13; '700 Opposition, 1 TTABVUE 6-7, ¶¶ 21-24; 4 TTABVUE 4, ¶¶ 21-24; Sergio Arras Declaration, 53 TTABVUE 3, ¶ 5.

- January 29, 2016, Applicant "petitioned [the Mexican Institute of Industrial Property "IMPI"] for an administrative statement on infringement"[65] against Empacadora Therbal S.A. de C.V. ("Empacadora Therbal"),[66] an entity that "produced [EUCALIN] syrup with the packaging labels" for Opposer.[67] On October 25, 2016 the IMPI granted, in part, Applicant's petition finding that Applicant owned rights to the EUCALIN mark in Mexico and that Empacadora Therbal infringed these rights under Article 213, section XVIII of the Industrial Property Law:

  > [Empacadora Therbal] manufactures the products under contract with the EUCALIN® denomination, to sell them first to Grupo Botanico Nayec SA de CV, which corporation in turn sells this product to the corporation Arsa Distributing Inc. and from said physical samples it is evident that ARSA Distributing Inc. appears as such product's distributor.[68]

- July 14, 2016, Applicant filed a petition to cancel Opposer's Registration No. 3912708 for the standard character mark EUCALIN;[69] the registration was subsequently cancelled on February 1, 2017 due to Opposer's failure to file a declaration under Section 8 of the Trademark Act;[70]

---

[65] We use the abbreviation IMPI because it is the abbreviation used by the Mexican Institute of Industrial Property.

[66] 61 TTABVUE 4.

[67] 64 TTABVUE 7 (confidential). For the reasons explained in Section I.B. above, this information was improperly filed under seal.

[68] 61 TTABVUE 17-19; *see also id.* at 14 (reproducing invoices from Empacadora Therbal to Grupo Botánico and Grupo Botánico to Arsa Distributing Inc. with an address in El Paso, Texas).

[69] 59 TTABVUE 4-5.

[70] 62 TTABVUE 4.

- August 17, 2016, Applicant "petitioned [the IMPI] for an administrative statement on infringement" of the mark EUCALIN against Grupo Botánico Nayec, S.A. de C.V. ("Grupo Botánico"),[71] an entity that "produced [EUCALIN] syrup with the packaging labels" for Opposer.[72] On March 31, 2017, the IMPI granted, in part, Applicant's petition against Grupo Botánico finding that Applicant owned rights to the EUCALIN mark in Mexico and that Grupo Botánico infringed these rights under Article 213, section XVIII of the Industrial Property Law:

  > [W]e find that Grupo Botánico … markets its products consisting of syrups under the EUCALIN denomination … in favor of Arsa Distributing Inc. and from said physical samples it is evident that Arsa Distributing Inc. appears as such product's distributor.[73]

- October 9, 2017, Applicant filed the involved application for the composite EUCALIN & Design mark.

**D. Analysis**

1. Manufacturer-Distributor Relationship

As summarized above, Applicant argues that Opposer was its U.S. distributor for EUCALIN dietary and nutritional supplements, and therefore, Opposer's use of the EUCALIN mark from 1999 to 2008 inured to Applicant's benefit conferring ownership of the mark to Applicant.

---

[71] 60 TTABVUE 4.

[72] 64 TTABVUE 7 (confidential). For the reasons explained in Section I.B. above, this information was not properly filed under seal.

[73] 60 TTABVUE at 17, 19.

Where, as here, there is no clear agreement between the parties, there is a legal presumption that the manufacturer, in this case Applicant, owns the mark. *UVeritech, Inc. v. Amax Lighting, Inc.,* 115 USPQ2d 1242, 1245-46, 1249 (TTAB 2015) (applying presumption where there was no written agreement and a dispute about whether there was an oral agreement). This presumption, however, may be rebutted. *Id.* In determining which party has superior rights, we consider the following factors, none of which alone is dispositive:

(1) which party created and first affixed the mark to the product;

(2) which party's name appeared with the trademark on packaging and promotional materials;

(3) which party maintained the quality and uniformity of the product, including technical changes;

(4) which party does the consuming public believe stands behind the product, *e.g.*, to whom customers direct complaints and turn to for correction of defective products;

(5) which party paid for advertising; and

(6) what a party represents to others about the source or origin of the product.

*Id.*

The first factor favors Applicant as Applicant created the mark and affixed it to the product.[74] As to the second factor, both parties' names appeared on the packaging, but Applicant was identified as the manufacturer, signaling to consumers that Applicant was responsible for the quality of the product. Accordingly, the second

---

[74] Rossana Arras Discovery Deposition, 70 TTABVUE 10-11; Sergio Arras Declaration, 53 TTABVUE 3, ¶ 7.

factor slightly favors Applicant.[75] Applicant created the product formula and maintained the quality and uniformity of the product so the third factor also favors Applicant.[76] Indeed, Opposer was not privy to Applicant's product formulation.[77] The fourth and fifth factors favor Opposer as consumers directed complaints and inquiries to Opposer[78] and Opposer paid for advertising EUCALIN products in the United States.[79] Lastly, as noted, the product packaging identified Applicant as the manufacturing entity that stood behind the goods as the source of origin.[80] Accordingly, the sixth factor also favors Applicant.

In sum, the first, second, third and sixth factors favor Applicant as Applicant created the mark and product, maintained quality control over the product, and was identified on product packaging as the manufacturer of the goods. The fourth and fifth factors favor Opposer as Opposer's telephone number and website address were provided on product packaging for consumer inquiries and Opposer paid for advertising the products. On balance, the factors favor Applicant. Accordingly, Opposer has not rebutted the presumption that Opposer's use of the mark from 1999 to October 2, 2008 inured to the benefit of Applicant as the owner of the mark.[81]

---

[75] Sergio Arras Declaration, 53 TTABVUE 4, ¶ 15. No promotional materials are of record so we do not know which party's name appeared with the trademark on promotional materials.

[76] Rossana Arras Discovery Deposition, 70 TTABVUE 10-11; Sergio Arras Declaration, 53 TTABVUE 3, ¶¶ 7, 12.

[77] Sergio Arras Declaration, 53 TTABVUE 5, ¶ 19.

[78] *Id.* at 4, ¶ 15.

[79] Medrano Declaration, 56 TTABVUE 3, ¶ 5.

[80] Sergio Arras Declaration, 53 TTABVUE 4, ¶ 15.

[81] Opposer argues that between 1999 to 2008, Applicant filed several U.S. trademark applications for EUCALIN and EUCALIN-formative marks and "[h]ad Salud believed that

2. Abandonment

We now consider whether Applicant abandoned its rights in the EUCALIN mark through nonuse.[82]

There are two elements to a nonuse abandonment claim: nonuse of the mark and intent not to resume use. 15 U.S.C. § 1127; *Exec. Coach Builders,* 123 USPQ2d at 1180. Evidence of nonuse of a mark for three consecutive years constitutes a prima facie showing of abandonment, and creates a rebuttable presumption that the owner

---

Arsa's sales of EUCALIN products inured to its benefit, it would have filed use-based applications and/or allegations or statements of use. It did not, and instead allowed each of these applications to go abandoned." Opposer's Brief, 75 TTABVUE 18-19. This argument is unpersuasive.

The Trademark Act permits an entity to seek registration under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), even if the mark is in use. Moreover, registration of a mark is not required to establish ownership. *Cf. Crash Dummy Movie, LLC v. Mattel, Inc.,* 601 F.3d 1387, 94 USPQ2d 1315, 1317 (Fed. Cir. 2010) ("Although Mattel later allowed its trademark registrations to lapse, cancellation of a trademark registration does not necessarily translate into abandonment of common law trademark rights.").

[82] Applicant's argument that Opposer has not pleaded abandonment as a ground for opposition is misplaced. Applicant's Brief, 77 TTABVUE 32. Neither of Applicant's applications are based on use so abandonment is not an available claim. *See Imperial Tobacco Ltd. v. Philip Morris Inc.,* 899 F.2d 1575, 14 USPQ2d 1390, 1395 (Fed. Cir. 1990) (a mark subject to an application filed under Section 44 of the Trademark Act is not vulnerable to an abandonment challenge until the mark registers); *Consolidated Cigar Corp. v. Rodriguez,* 65 USPQ2d 1153, 1155 (TTAB 2002) (a claim of abandonment cannot arise with respect to a Section 1(b) application until after an allegation of use is filed).

Whether Applicant abandoned the EUCALIN mark is part of the priority analysis under the ground of likelihood of confusion. If Applicant had prior common law rights but abandoned the mark, the earliest dates it may rely on for priority are the filing dates of its applications.

Applicant was on notice that Opposer would raise abandonment as a challenge to any assertion by Applicant of prior common law rights. *See* '700 Opposition, Notice of Opposition, 1 TTABVUE 7, ¶ 35 ("ARSA's EUCALIN mark has priority over the proposed EUCALIN mark of Salud as Salud was expressly prohibited from selling any products in and into the United States beginning in or around October 2008 and at least until May 22, 2015."); '240 Opposition, Notice of Opposition, 1 TTABVUE 4, ¶ 17 ("ARSA's EUCALIN mark has priority over the proposed EUCALIN mark of Salud as Salud was expressly prohibited from selling any products in and to the United States beginning in or around October 2008.").

has abandoned the mark without intent to resume use. 15 U.S.C. § 1127; *Exec. Coach Builders,* 123 USPQ2d at 1180; *Rivard v. Linville,* 133 F.3d 1446, 45 USPQ2d 1374, 1376 (Fed. Cir. 1998). The statutory presumption of abandonment applies not only to a registered mark but also to a party's unregistered common law mark. *Hornby v. TJX Cos.,* 87 USPQ2d 1411, 1421 (TTAB 2008).

If the party alleging abandonment makes a prima facie case of abandonment, the burden of production, (i.e., going forward), shifts to the party contesting the abandonment "to produce evidence that it has either used the mark or that it has intended to resume use." *Azeka Bldg. Corp. v. Azeka,* 122 USPQ2d 1477, 1485 (TTAB 2017); *see also On-Line Careline, Inc. v. Am. Online, Inc.,* 229 F.3d 1080, 56 USPQ2d 1471, 1476 (Fed. Cir. 2000) (same). The burden of persuasion, however, always remains with the party asserting abandonment to prove it, by a preponderance of the evidence. *Exec. Coach Builders,* 123 USPQ2d at 1180-81 (citing *Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 892 F.2d 1021, 13 USPQ2d 1307, 1309 (Fed. Cir. 1989)).

There is no dispute that Applicant has not used the EUCALIN mark in the United States since October 2, 2008 when it was prohibited from conducting business in the United States as a sanction.[83] Accordingly, although Opposer focused on the three

---

[83] Notice of Opposition, '700 Opposition, 1 TTABVUE 6, ¶ 25; Answer, '700 Opposition, 4 TTABVUE 4, ¶ 25 (admitting that "[f]ollowing the Kingpin Act sanction beginning in or around October 2008 and until May 22, 2015, Salud did not sell or distribute any products in the United States."); *see also* 51 TTABVUE 101 (admitting Request for Admission 14 that "Applicant did not sell any EUCALIN-branded products into the United States between October 2008 and May 22, 2015, either directly or through a distributor."); *id.* at 107 (responding to Interrogatory No. 3 that Applicant has not sold EUCALIN-products in the U.S. since October 2, 2008).

year period between October 2, 2008 and October 2, 2011, Opposer has established a prima facie case of abandonment based on any three-year period of consecutive nonuse since October 2, 2008. The burden therefore shifts to Applicant to produce evidence of an intent to resume use.[84]

Applicant "must put forth evidence with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred." *Imperial Tobacco*, 14 USPQ2d at 1394-95; *Double Coin Holdings Ltd. v. Tru Dev.,* 2019 USPQ2d 377409, at *15 (TTAB 2019) (Board examines efforts during the period of nonuse); *Yazhong Investing Ltd. v. Multi-Media Tech Ventures, Ltd.,* 126 USPQ2d 1526, 1538 (TTAB 2018). The Board may consider evidence regarding activities that occurred before or after the three-year period of nonuse to infer intent to resume use

---

[84] We give no consideration to Applicant's argument that Opposer's continued use of the EUCALIN mark in the U.S. during the nonuse period inured to Applicant's benefit such that Applicant could overcome the presumption of abandonment based on nonuse. In response to a request for admission, Applicant admitted that it "did not sell any EUCALIN-branded products into the United States between October 2008 and May 22, 2015, either directly **or through a distributor**." 51 TTABVUE 101, Admission to Request for Admission 14 (emphasis added); *see also id.* at 107, Response to Interrogatory No. 3.

We add that even if Applicant had not made this admission, we could not recognize sales of EUCALIN-branded products in or to the United States during the OFAC sanctions period as inuring to Applicant's benefit because sales for Applicant's benefit during that period were prohibited under the Kingpin Act. 21 U.S.C. § 1904(c) (prohibiting "any transaction or dealing . . . within the United States, in property or interests in property of any" SDNT); *see also Clorox Co. v. Armour-Dial, Inc.,* 214 USPQ 850, 851 (TTAB 1982) ("It has been the consistent position of this Board and the policy of the Patent and Trademark Office that a 'use in commerce' means a 'lawful use in commerce,' and the shipment of goods [unlawfully] may not be recognized as the basis for establishing trademark rights."). The record does not contain any evidence of an exception to engage in transactions prohibited by the Kingpin Act for Applicant or Opposer, if Opposer could be considered Applicant's distributor during the period the OFAC sanctions were in effect.

during the three-year period. *Exec. Coach Builders,* 123 USPQ2d at 1199 (citing *Crash Dummy Movie,* 94 USPQ2d at 1317).

"Intent to resume use in abandonment cases has been equated with a showing of special circumstances that excuse nonuse." *Exec. Coach Builders,* 123 USPQ2d at 1198. If a mark owner's nonuse is excusable, it has overcome the presumption that its nonuse was coupled with an intent not to resume use; if the activities are insufficient to excuse nonuse, the presumption is not overcome.[85] *Id.*; *see also Imperial Tobacco,* 14 USPQ2d at 1395.

A mark owner must show that, "under [its] particular circumstances, [its] activities are those that a reasonable business[], [that] had a bona fide intent to use the mark in United States commerce, would have undertaken." *Executive Coach Builders,* 123 USPQ2d at 1198; *see also Imperial Tobacco*, 14 USPQ2d at 1395.

The intent must be to resume use of the mark within the reasonably foreseeable future once the reason for suspension abates. *Hornby,* 87 USPQ2d at 1422 ("A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume

---

[85] In *Double Coin,* the defendant asserted that it was "unreasonable" for the plaintiff to have ceased use of its mark because of the imposition of a tariff on its goods. We explained: "Our task is not to determine whether Double Coin's decision to discontinue sales in the United States in response to the imposition of tariffs, in-and-of-itself, was 'excusable,' that is, a reasonable business judgment under the circumstances. That is not what the statute requires us to do. Rather, as noted above, we must examine the activities that Double Coin engaged in during the period following cessation of use to determine whether we may infer from those circumstances an intent not to resume use." 2019 USPQ2d 377409, at *14-15. While we do not consider the reasonableness of a business decision to cease use of a mark by itself, the reason for the cessation of use may be relevant to whether there are "special circumstances" that excuse the nonuse or whether use was discontinued with the intent not to resume use.

use in the reasonably foreseeable future when the conditions requiring suspension abate.") (quoting *Silverman v. CBS Inc.,* 870 F.2d 40, 9 USPQ2d 1778, 1783 (2d Cir. 1989); *see also Azeka Building,* 122 USPQ2d at 1487 ("Once the challenger shows discontinued use, the owner must produce evidence of intent to resume use within the reasonably foreseeable future.") (internal quotation marks omitted); J. Thomas McCarthy, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 17:16 (5th ed. Sept. 2002 update) ("[A]s soon as the external cause has passed, the user must resume use within a reasonable time."). "[W]hat is meant by the 'reasonably foreseeable future' will vary depending on the industry and the particular circumstances of the case[.]" *Azeka Building,* 122 USPQ2d at 1487 (quoting *Emergency One Inc. v. Am. FireEagle Ltd.,* 228 F.3d 531, 56 USPQ2d 1343, 1348 (4th Cir. 2000)).

Opposer argues:

> Salud failed to produce any testimony or documentation establishing that Salud had concrete plans … of intent to resume use between 2008 and 2015 … and indeed it could not as it was legally banned from conducting business in the United States until May 2015[.]… Thus, even if Salud … ever had rights in the United States – which Arsa denies – such rights were abandoned as Salud proffers no evidence of an intent to resume commercial use in the United States within the three-year period of non-use between October 2, 2008 and October 2, 2011. At that time, the ECUALIN mark "reverts back to the public domain whereupon it may be appropriated by anyone who adopts the mark for his or her own use."[86]

Applicant asserts that "the ban from conducting business in the United States as a sanction" constitutes "an excusable non-use."[87] Applicant further argues that it

---

[86] Opposer's Brief, 75 TTABVUE 23 (quoting *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F. Supp. 1339, 1355 (E.D.N.Y. 1994)).

[87] Applicant's Brief, 77 TTABVUE 32.

maintained an intent to resume use of the mark as shown by: (1) the application it filed for the standard character mark EUCALIN on October 6, 2015 "as soon as Applicant was allowed to do business in the United States"; (2) the infringement actions it filed in Mexico against the two companies supplying Opposer's U.S. EUCALIN products; and (3) the petition to cancel that it filed against Opposer's now-cancelled registration for the mark EUCALIN.[88]

This is not a case where Applicant decided to cease use of its mark for business reasons. Rather, Applicant had no choice but to cease use of its mark because its use was prohibited by government sanctions banning it from doing business in the United States for the period it was identified as a SDNT.

Abandonment generally "does not result from a mere temporary withdrawal from the market forced by outside causes ('excusable nonuse')[.]"*Miller Brewing Co. v. Oland's Breweries (1971) Ltd.,* 548 F.2d 349, 192 USPQ 266, 267 (CCPA 1976); *see also, e.g., P.A.B. Produits Et Appareils de Beaute v. Satinine SNC di S.A. e. M. Usellini,* 570 F.2d 328, 196 USPQ 801, 806 (CCPA 1978) ("[T]he inference of abandonment is readily rebutted by a showing that such nonuse was due to special circumstances which excuse the same and not due to any intention to abandon the mark." ); *Am. Lava Corp. v. Multronics, Inc.,* 461 F.2d 836, 174 USPQ 107 (CCPA 1972) (circumstances including litigation and Vietnam War excused nonuse); *Sterling Brewers, Inc. v. Schenley Indus. Inc.,* 441 F.2d 675, 169 USPQ 590, 593 (CCPA 1971) (closing of brewery was excusable because it "was the result of a

---

[88] Applicant's Brief 77 TTABVUE 24-25 (redacted); 76 TTABVUE 24-25 (confidential).

strike and not a voluntary act by [the mark owner]"); *Kelly Liquor Co. v. Nat'l Brokerage Co.,* 102 F.2d 857, 41 USPQ 311, 314 (CCPA 1939) ("the fact that, while prohibition was in force, said trade-mark was not used, did not constitute an abandonment of the same"); *see also In re Moorman Mfg. Co.,* 203 USPQ 712, 714 (Comm'r Pat. 1979) (discussing excusable nonuse in the context of a Section 8 affidavit: "[I]t appears fairly clear that in situations where nonuse is compulsory, such as was the case during the era of prohibition of the sale of liquor, no intention to abandon use of a mark may be presumed from nonuse during the period of such prohibition.").[89]

In addition, soon after the sanctions were lifted on May 15, 2015, and it became legally permissible for Applicant to resume use of the EUCALIN mark and otherwise conduct business in the United States, Applicant took steps evidencing an intent to resume use of the mark in the United States. *Executive Coach Builders,* 123 USPQ2d at 1199 (the Board may consider evidence regarding activities that occurred after the statutory three-year period of nonuse) (citing *Crash Dummy Movie,* 94 USPQ2d at 1317). Specifically, within five months of the sanctions being lifted, Applicant filed a U.S. application for the mark EUCALIN (on October 6, 2015).[90] Applicant also took steps to remove Opposer as an obstacle to its re-entry into the U.S. market, filing (on

---

[89] Although the *Moorman* case dealt with a maintenance filing, it is still pertinent as the Federal Circuit has explained that "a showing of special circumstances which excuses a registrant's nonuse [in the context of an abandonment claim]… is the same type of showing required in Sections 8 and 9 with respect to declarations of continued use for maintenance and renewal." *Imperial Tobacco,* 14 USPQ2d at 1395 and n.10.

[90] Involved application Serial No. 86779422.

July 14, 2016) a petition to cancel Opposer's U.S. registration for the EUCALIN mark that Opposer had obtained during Applicant's compulsory period of nonuse.[91]

During the same time frame, Applicant filed in Mexico petitions for infringement against the Mexican entities supplying Opposer's U.S. EUCALIN products.[92] The IMPI found that the entities were infringing Applicant's Mexican rights in the EUCALIN mark and ordered each entity "to abstain from using the EUCALIN denomination on the products it sells."[93] These were the only entities supplying Opposer products to sell under the EUCALIN mark in the United States.[94] Accordingly, the Mexican actions directly affected Opposer's ability to sell EUCALIN products in the United States. Even though these proceedings took place outside the United States, they demonstrate Applicant's efforts to eliminate or disrupt the supply of Opposer's EUCALIN products in an effort to remove Opposer as an obstacle to Applicant resuming use of the EUCALIN mark in the United States.

Based on these activities, taken soon after sanctions were lifted, and the fact that Applicant's nonuse was a result of being prohibited from use during a specific time

---

[91] 59 TTABVUE 4-5.

[92] 60 TTABVUE; 61 TTABVUE.

The images of the infringing products displayed in the IMPI opinions are substantially similar to the photograph of the EUCALIN product Opposer filed as a specimen in support of its now-cancelled EUCALIN registration. *Compare* 60 TTABVUE 10 and 61 TTABVUE 11 *with* 15 TTABVUE 15.

[93] 60 TTABVUE 31; 61 TTABVUE 30.

[94] 64 TTABVUE 6-7 (confidential).

To be clear, while any rights Applicant may have in the EUCALIN mark in Mexico are not relevant to the issue of priority in the United States, the actions Applicant took at the IMPI are relevant for the reason stated.

period resulting from the OFAC-imposed sanctions, we find that Applicant maintained an intent to resume use of the EUCALIN mark during its period of compulsory nonuse and beyond.

Opposer argues the fact that Applicant has not yet resumed sales of EUCALIN products in the United States nearly seven years after the sanctions were lifted demonstrates that Applicant did not maintain an intent to resume use in the reasonably foreseeable future.[95] This argument is unpersuasive.

Since July 14, 2016, just over one year after the sanctions against Applicant were lifted, the parties have been involved in litigation before the Board regarding the EUCALIN mark in the U.S.[96] Applicant's vigorous defense of the oppositions supports a finding that Applicant has maintained an intent to resume use of the EUCALIN mark throughout the parties' litigation. *Penthouse Int'l, Ltd. v. Dyn Elecs., Inc.,* 196 USPQ 251, 257 (TTAB 1977) (finding applicant's efforts to defend opposition evidenced an intent not to abandon the mark). We further find that Applicant's nonuse during the pending dispute between the parties over ownership of the EUCALIN mark in the United States constitutes excusable nonuse negating the inference of abandonment. *Penthouse,* 196 USPQ at 257 ("Nonuse of a mark pending the outcome of litigation to determine the right to such use or pending the outcome

---

[95] Opposer's Brief, 75 TTABVUE 23-24.

[96] Although Opposer's U.S. registration for the EUCALIN mark was cancelled on February 1, 2017 for failure to file a Section 8 declaration, Applicant's petition to cancel the registration, filed July 14, 2016, was not dismissed until June 22, 2018. 59 TTABVUE 4; 62 TTABVUE 4. In the interim, Opposer filed the first of these consolidated oppositions on March 22, 2018.

of a party's protest to such use constitutes excusable nonuse sufficient to overcome any inference of abandonment."); *see also Imperial Tobacco,* 14 USPQ2d at 1395 ("[T]he Board recognized that suspension of actual use, or plans to use a mark pending resolution of litigation, may serve to justify nonuse[.]").

In sum, taken together, the circumstances here are sufficient to overcome the presumption that Applicant abandoned the EUCALIN mark for "dietary and nutritional supplements." Applicant's nonuse of the mark from October 2, 2008 to May 22, 2015 was due to government sanctions prohibiting it from doing business in the United States while Applicant was a SDNT. Within a reasonable time after the sanctions were lifted, Applicant filed the application for the standard character mark at issue in this proceeding and started taking steps to remove Opposer as an obstacle to its resumption of use in the United States, evidencing an intent to resume use in the reasonably foreseeable future after the sanctions were lifted. The parties' litigation before the Board concerning ownership of the EUCALIN mark in the U.S. constitutes a basis for further excusable nonuse.

In view of the foregoing, we find that Opposer has failed to prove that Applicant abandoned the EUCALIN mark with an intent not to resume use.

### E. Priority Determination

As discussed above, Opposer's use of the EUCALIN mark in the United States from 1999 to October 2, 2008 inured to Applicant's benefit as the manufacturer of the goods and Applicant has rebutted the presumption that it abandoned the mark after October 2, 2008. Accordingly, we find that Applicant owns common law rights in the

United States for the mark for "dietary and nutritional supplements" since 1999. The earliest date on which Opposer can rely for priority is late 2008 when it started selling EUCALIN "dietary and nutritional supplements" manufactured by a third party.

Because Opposer's first use date is after Applicant's first use date, Opposer has failed to prove priority as necessary to prevail on its Section 2(d) claim.[97]

## IV. Requirement that Opposer File Partially Redacted Responses to Applicant's Interrogatory Nos. 1 and 2

Pursuant to Section I.B above, Opposer is allowed until **thirty days** from the date of this decision to file with the Board and serve on Applicant a redacted version of its responses to Interrogatory Nos. 1 and 2 in which the following information is nonredacted: the entities that "ha[ve] produced products" for Opposer before 2017, and the entities "that originally … produced the syrup with the packaging and labels" for Opposer, failing which 64 TTABVUE (which is currently confidential) may be re-designated public in its entirety. *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1476 n.19 (TTAB 2017).

## V. Decision

The oppositions are **dismissed** because Opposer has failed to establish priority in its pleaded EUCALIN mark.

---

[97] In view thereof, Applicant's affirmative defense of unclean hands in the '240 Opposition is moot.